**E. ANTHONY & SONS, Inc., v. NATIONAL LABOR RELATIONS BOARD.**

No. 9385.

United States Court of Appeals
District of Columbia.

Argued March 11, 1947.

Decided June 23, 1947.

Writ of Certiorari Denied Oct. 13, 1947.

See 68 S.Ct. 89.

CLARK, J., dissenting.

Mr. Elisha Hanson, of Washington, D. C., with whom Messrs. William K. Van Allen, of Washington, D. C., and Arthur B. Hanson, of Washington, D. C., were on the brief, for petitioner.

Mr. David Findling, Attorney, National Labor Relations Board, with whom Mr. A. Norman Somers, Assistant General Counsel, National Labor Relations Board, and Mr. Henry W. Lehmann, Attorney, National Labor Relations Board, both of Washington, D. C., were on the brief, for respondent.

Before GRONER, Chief Justice, and CLARK and PRETTYMAN, Associate Justices.

PRETTYMAN, Associate Justice.

This case is here upon a petition by E. Anthony & Sons, Inc. (hereinafter called the company or the petitioner), praying that the court review and set aside an order issued by the National Labor Relations Board (hereinafter called the Board); [1] and upon a petition by the Board, praying that the court enter a decree enforcing the order of the Board and requiring the company and its officers, etc., to comply therewith. [2]

The company is the publisher of two newspapers at New Bedford and Hyannis, Massachusetts. The Board issued a complaint against it, alleging that it had violated Sections 8(1) and 8(3) of the National

[1] Sec. 10(f) of the National Labor Relations Act, 49 Stat. 455, 29 U.S.C.A. § 160(f).

[2] Sec. 10(e) of the National Labor Relations Act, 49 Stat. 454, 29 U.S.C.A. § 160(e).

Labor Relations Act.[3] Testimony was taken before an examiner, who filed an intermediate report with findings of fact, conclusions of law, and recommendations. Exceptions to the report were taken by the company, and the matter was heard by the Board. The Board, with one member dissenting, issued an order requiring the company to cease and desist from discouraging membership of its employees in the American Newspaper Guild or in any other labor organization, and from interfering in any manner with the exercise by the employees of the right to self-organization. The order also required the company to reinstate five employees who had been discharged, and to pay them sums equivalent to the wages which they would have earned during the period of their discharge, and to make whole two other discharged employees for loss of pay suffered by the company's discrimination against them.

It appears that an organization known as the Newspaper and Radio Workers' Protective Association of Southeastern Massachusetts was formed among the company's employees. The principal organizers were one Kramer, who was then or had been the general business manager of the company, and one Cooper, who was then or had been its circulation director. There is a dispute at to whether Kramer and Cooper actually organized the union while they were supervisory employees of the company or whether they first resigned. In any event, they did resign at or about the time of the meeting for the organization of the union. Shortly after this meeting, the seven employees involved in this case were severally discharged. On February 18th the original union was dissolved and its members joined the American Newspaper Guild, except that Kramer and Cooper were ineligible to membership in the Guild and did not join it.

The Board held that the company's conduct constituted a violation of Section 8(1) of the Act, which provides that it shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by the Act; and it held that the company had discriminated against the seven employees by discharging them for the purpose of discouraging their membership in a labor organization, in violation of Section 8(3) of the Act, which provides that it shall be an unfair labor practice for an employer, by discrimination in regard to tenure of employment or any term or condition of employment, to encourage or discourage membership in any labor organization. Thereupon the company filed its petition in this court, and the Board answered and petitioned for a decree enforcing the order. The case is in two phases, the first relating to the validity of the order itself and the second relating to the refusal of the Board to admit certain proffered evidence.

■ On the first phase of the case the company makes two contentions. First it says that these seven employees were discharged for reasons wholly apart from their union activities. Second it says that the company had a right to discharge them for activity or membership in the union, because the union was illegal and therefore not a labor organization within the meaning and protection of the statute having been formed in violation of Section 8(2) of the Act.[4] The first contention raises questions of fact. As to them we are limited in our review to a determination whether the findings are supported by substantial evidence.[5] The second contention raises a question of law, which is for us to determine.[6]

■ In our examination of the sufficiency of the evidence to support the Board's findings of fact, we must look first to the evidence cited to us by the Board as being in support of the findings. If that evidence is substantial, our inquiry is at an end. We cannot weigh the evidence or

---

[3] 49 Stat. 452, 29 U.S.C.A. § 158(1) and (3).

[4] 49 Stat. 452, 29 U.S.C.A. § 158(2):
"Sec. 8. It shall be an unfair labor practice for an employer—
"* * * *
"(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: * * *"

[5] Sec. 10(e) of the Act, supra note 2.

[6] National Labor Relations Board v. Waterman S. S. Co., 1940, 309 U.S. 206, 208, 60 S.Ct. 493, 84 L.Ed. 704.

resolve contradictions in it if that supporting each conclusion is substantial. [7]

The seven employees involved were Silveira, Ellison, Harden, Boff, Thompson, Ainsworth, and Simas. John Silveira had been in the company's employ for fourteen or fifteen years. He became its city circulation manager in New Bedford, in charge of district managers, who were in charge of branch managers. He joined the union, became active in securing members and, at its first meeting, January 30, January 31, or February 1, 1945, was elected vice president. A day or two later the business manager of the company asked Silveira about the operation of a "kitty". In another day or two Silveira was relieved of his duties. Two weeks later he was given a letter of discharge, which said that he had been collecting a kitty from newspaper carriers, without the knowledge or consent of the company and without accounting for the money. The kitty was a fund which the two city circulation managers had, made up of money collected from news carriers in their first week of employment on a paper route, and used to pay for broken windows or other damages by the newsboys, and to balance dead accounts of carriers who left their routes without paying their bills in full. Silveira testified that the prior business manager, Cooper, his superior, had always known about the kitty and had approved the practice, and that the bookkeepers and all the district managers knew of it.

Silveira took the letter of discharge as a suggestion of dishonesty and was insistent that his name be cleared. He testified that, when he talked to the business manager, "He wanted me to break away from the gang. To break away from the group that I was connected with, the union." Silveira resigned from the union. The business manager later assembled the district managers and permitted Silveira to make a statement to them that he had been cleared of all charges in connection with the kitty. Meantime, on the day following Silveira's discharge, the business manager told another person, "we got rid of two members of the union this morning, John

Silveira, who was vice-president, and Mary Harden, who was secretary."

Edmund Ellison had been employed for seventeen years and became circulation manager at Hyannis. He joined the union, attending the first meeting, and was thereafter active in it. The day after the first meeting, the business manager of the company sent for him and for four hours discussed the union, asking Ellison why a man of his intelligence and ability decided it was necessary to join a union and telling him that his future was apparently being jeopardized and that he could not understand why a man in Ellison's situation would consider joining the union. Three times later officials of the company asked Ellison about the union. On February 14th they asked him whether he had maintained a kitty. Ellison replied that he and all the district managers, with one exception, maintained kitties and that the business manager, his superior, had known of it and had indicated his approval. That same day Ellison was given a letter, stating that he was discharged for inducing carriers to break their contracts with the company, collecting money for which no accounting was made, and participating in outside business activities on company time. The reference to inducing carriers to break their contracts was to Ellison's activity in getting members for the union.

Mary Harden had worked for petitioner for more than thirteen years and had become head bookkeeper and secretary to Cooper, the circulation director. Her work had always been complimented by the company's executives. She was active in securing members for the union and was elected its secretary at the first meeting. The next day the new business manager called her into the office and questioned her about the union. He asked her, "Just as a matter of curiosity, what does an intelligent girl like you except to get out of a union?" She testified that he "went on to argue with me pro and con on what a union would get me," and also that "He at that time expressed the fact that he thought my work was very satisfactory, that I was one of the most intelligent girls working for the Stand-

[7] National Labor Relations Board v. Nevada Copper Co., 1942, 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305.

ard-Times." The following day her old duties were taken from her and no effort was made to find other work for her to do. On February 15th she was discharged with a letter which assigned neglect of work, disregard of instructions, and interference with the work of others of the department. The business manager's remark concerning her discharge and that of John Silveira has already been quoted.

Sylvester Boff had been with the company only a few months when the union was formed and he joined it. He was advertising salesman and collector at Hyannis. Before he joined the union, two of his superiors asked him about the organization and told him, "You realize forming a union is really like a couple of gangsters living off the profits of the youngsters." The day after he joined the union, officials of the company told him that they had knowledge of that fact. When he denied it and some conversation ensued on that topic, one of these officials said to him, "We are getting off the track. Your work is not as efficient as it should have been. In other words, we are going to let you go for inefficiency." That same day, the day after he joined the union, he was discharged. Prior to this incident, and prior to the organization of the union, these same officials of the company had complimented Boff from the second week he was with the company and had told him that he was "doing a grand job."

William Thompson had been employed about six months. He started as a truck driver and became a district circulation manager. He joined the union at about the time of its organization. Officials of the company called at his home repeatedly, once near midnight, and finally called him into their office and asked him whether he had joined the union and what his sympathies toward it were. When he replied that he was in favor of it, they told him that the organizers were "a bunch of racketeers". On February 15th Thompson was discharged with a letter stating that the reason was "soliciting carrier boys to break their contracts", which referred to his activity in asking the boys to sign applications to join the union. Thompson testified that he never urged any carrier to break

his contract with the company; no contradictory testimony on that point was presented.

Bilsborrow Ainsworth was a truck repairman and had been with the company a little over two years, during which time he had been promoted at least twice. He joined the union and attended its first meeting and another meeting on February 18th. Upon the latter occasion he saw the new circulation manager sitting in a car in front of the entrance to the building in which the meeting was held, obviously observing those who attended. Three days later he was discharged with a letter in which the reasons assigned were neglect of work in sending out trucks which were unfit for duty, taking time out while on duty to discuss outside matters, and "disloyalty to the management". The company says that one of its trucks broke down on four successive days. Ainsworth testified that the truck was four years old and had gone about 200,000 miles with the same motor. The difficulty with it was that the gas line broke and the brake fluid line broke, each time while the truck was out on the road. Ainsworth had seventeen trucks under his supervision.

Manuel Simas was a truck driver who had been employed for a year. He joined the union at its first meeting and attended all its other meetings. He saw the circulation manager observing those who attended one meeting. The business manager remarked to him, "We were afraid of you because you belong to the Guild." He was discharged, three reasons being assigned him. He denied on the witness stand all the facts assigned as grounds for the discharge; the company offered no evidence of the assigned facts.

There are three striking general characteristics in this evidence. In the first place, some of these employees had been long-time, responsible and faithful employees, and others had been commended for their work. All were discharged summarily, without preliminary warning, admonition or opportunity to change the act or practice complained of. Such action on the part of an employer is not natural. If the employer had really been disturbed by the circumstances it assigned as reasons

for these discharges, and had had no other circumstance in mind, some word of admonition, some caution that the offending lapse be not repeated, or some opportunity for correction of the objectionable practice, would be almost inevitable. The summariness of the discharges of these employees, admittedly theretofore satisfactory, gives rise to a doubt as to the good faith of the assigned reasons.[8] In the second place, all the discharges took place promptly after the union was formed and these employees joined it. In the third place, the evidence is clear that the officials of the company were greatly perturbed at the formation of the union and were absolutely opposed to it. It is highly significant that they talked with each of these employees about membership in the union and certainly tried to discourage some of them from joining it. It is undisputed that officials of the company watched those attending at least one union meeting. They directly attempted to dissuade at least one other employee from joining the union. Clearly the unionization of the employees was much in the minds of the company's officials.

■■ The prohibition of the statute is against interference with, restraint or coercion of employees in the exercise of their right to organize, and against encouragement or discouragement of membership in a labor organization by discrimination in regard to tenure of employment or any term or condition of employment. The statute does not interfere with the normal right of an employer to discharge employees for good reason;[9] or at will if such discharge be not in violation of the statutory prohibition. In the case before us, the company claims good reasons for the discharges. So the ultimate fact to be determined is the real reason or reasons for the discharges. That fact is necessarily an inference from the proven facts and circumstances. Was there substantial evidence in support of the Board's conclusion of fact that the motivating factor in, and also the effect of, the company's conduct was interference with and coercion of employees in their attempts to organize? We think that there was. We need not repeat the evidence, already summarized, to which the Board points as supporting its findings. The summary shows its substance. The composite background and the individual incidents in connection with each of the discharges furnish substantial support for the conclusions of the Board.[10]

We have not failed to examine the points made by the company in respect to the facts, or the portions of the record cited to us by it. We examined them because those references might throw doubt upon the substance of the evidence to which the Board points. But in this case we did not find it so. In only a few instances were the evidentiary facts disputed. The company presented only one witness, a bookkeeper who showed the records in connection with Boff's activities as advertising salesman. The company's claims as to the circumstances of, and also the reasons for, discharges were brought out by the testimony, on direct and cross examination, of the employees involved. The employees testified as to what they were told, orally or in writing, were the reasons. No official of the company took the witness stand to state authoritatively its reasons for the discharges or to explain them. In the main, the company relied upon its claim that the staff of the Board had failed to prove a case, and upon its points of law.

■ The company's second contention is that the union was illegal; hence it could be destroyed; and, therefore, the discharge of employees for belonging to it was proper. But the nature of the alleged illegality must be considered. The union is alleged to be illegal because the company dominated it

[8] See National Labor Relations Board v. Willard, Inc., 1938, 68 App.D.C. 372, 98 F.2d 244; National Labor Relations Board v. American Potash & C. Corporation, 9 Cir., 1938, 98 F.2d 488, certiorari denied, 1939, 306 U.S. 643, 59 S. Ct. 582, 83 L.Ed. 1043.

[9] National Labor Relations Board v. Fansteel Corporation, 1939, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; National Labor Relations Board v. Jones & Laughlin, 1937, 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

[10] Cf. National Labor Relations Board v. Bradford Dyeing Assn., 1940, 310 U. S. 318, 326–330, 60 S.Ct. 918, 84 L.Ed. 1226.

or interfered with it. Thus the argument in actual essence is that if a company interferes with a union enough to make it illegal, employees can then be discharged for belonging to it. That obviously cannot be so. The process would be too simple. To prevent unionization, all an employer would have to do would be to interfere with it.

The extent of the right of an employer under Section 8(2) is to reverse the wrong he himself has committed; that is, to eliminate the domination or interference he himself has exercised or caused. He cannot, by wrongfully dominating or interfering with a union, confer upon himself a right which he would otherwise not have, that is, the right to destroy the union. The language of the section is designed to protect the labor organization from interference or domination by the employer, and not for the protection of the employer against the organization of a union.[11]

The company contends that the original union was not a labor organization within the meaning of the statute. It says that an organization formed in contravention of Section 8(2) cannot be a labor organization protected by the Act. The contention is an afterthought. The company's activity and opposition stemmed from the fact that it regarded the union as a labor organization. Except as it considered the organization a labor organization, its opposition would have been pointless. It treated the union as a labor organization, and the discharges are attributable to that fact. Moreover, when analyzed into its syllogistic components, the argument refutes itself. Section 8(2), upon which the contention depends as showing the illegality of the union, relates only to labor organizations; it prohibits interference with a "labor organization". So, if this union be not a labor organization, it is not covered by Section 8(2), and a necessary premise of the contention disappears. Syllogistically stated, the argument is: A labor organization interfered with is illegal. This union was interfered with. Therefore, this union was not a labor organization. The logical fallacy is obvious.

Less striking, but nonetheless conclusive, are two other considerations. The first is that Section 8(2) does not declare a company dominated organization "illegal" in any all-embracive sense.[12] It forbids company domination of or interference with labor organizations, and by rule of the Board, approved by the courts, it prohibits a company from bargaining with an organization which it dominates. The rationale is plain. In plain terms, it simply is that a company cannot bargain with itself and pretend that thereby it is bargaining with its employees. The "disestablishment" of such organizations, required by that rule, is the severance of bargaining relations. The second consideration is that the statutory definition of a "labor organization" for purposes of the Act is "any organization of any kind," etc.[13]

The other phase of the case concerns a proffer of evidence by the company. At the hearing, and again by motion in this court, the company sought to introduce testimony by one Dr. Myers and also to present certain papers pertaining to certain cases before the Board. The cases were premised upon petitions of the original union and its auxiliary for certification as bargaining representatives of the employees, or units of them; a petition of the Guild for the same purpose; and charges of unfair labor practices made against the company by the original union and by one of the discharged employees. All of these cases were withdrawn.

Dr. Myers was formerly Regional Director for the Board stationed in Boston. In its brief the company states the ground for the proffer of his testimony as follows: "The circumstances surrounding the formation of the Kramer-Cooper Association are of vital importance in this proceeding. They were well-known to Dr. Myers." But it would appear from the record that Dr. Myers knew only what Kramer and Cooper, and perhaps others, had told him. His testimony as to the

---

[11] H. J. Heinz Co. v. National Labor Relations Board, 1941, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309.

[12] Sec. 10(a) of the Act, 49 Stat. 453, 29 U.S.C.A. § 160(a).

[13] Sec. 2(5) of the Act, 49 Stat. 450, 29 U.S.C.A. § 152(5).

circumstances surrounding the formation of the union was clearly hearsay. The Board was within its discretion in refusing to receive such evidence and in putting the company to its proof by persons who had first-hand knowledge of the facts sought to be proved. Kramer and Cooper and many other original members of the union were available to subpoena, and although they might have been hostile witnesses, it cannot be presumed that they would have testified falsely.

Some of the papers sought to be introduced were, according to the company's brief, memoranda or reports concerning interviews with Kramer or Cooper; representations made by them to the Board respecting the cases above described; memoranda pertaining to any order of dismissal of those cases; memoranda, reports, correspondence or other material bearing upon the entry of the Guild in the situation; and the complete files of the office concerning investigations made by the Board's representatives in connection with one of these cases. In part these papers were hearsay as to the facts therein stated, and in part they were not the best evidence; and, furthermore, they were not relevant.

 The Board denied the request upon the ground that the evidence was not material to any issue in this case. That ruling applied not only to the informal papers but to the formal papers on the docket of the Board. The company says that the proffered testimony relates to the background of the organization of the union and the succession by the Guild to the original organization. The importance of the point to petitioner is to support its contention that the original union was illegal. Its argument is that since Kramer and Cooper, supervisory employees, participated in the formation of the union, the union was company dominated, or interfered with, and hence illegal. It seeks to prove those facts. But, as we have pointed out, even if the facts as to the participation by Kramer and Cooper be proved as the company alleges, the point it makes is not sound. The issue whether the union was formed in violation of Section 8(2) of the Act is irrelevant to the issue whether the company violated the same section by discharging employees for joining that union. It follows that the introduction of this testimony would not benefit the company.

While the rule is generally stated to be that evidence (otherwise admissible) is admissible if relevant to any issue framed by the pleadings, or to any claim or defense, that statement is not accurate to its full literal extent. The issues, or claims or defenses to which the statement refers are those which are material to the rights of the parties. This is a matter of substantive law which underlies questions of evidence. "The question, therefore, 'Of what Propositions may Evidence be offered?' is not answered by the law of Evidence, except in a subordinate way." [14] To state it another way, "Evidence directed to proof of an immaterial issue is not material." [15] It follows that because as a matter of substantive law the fact for which this proof was offered was immaterial to the issue of unfair labor practices posed by the complaint and answer, the refusal of the Board to receive the proof was not error. The statute requires a party applying for leave to adduce additional evidence to "show to the satisfaction of the court that such additional evidence is material". [16]

 The company's motion to adduce proof that Kramer and Cooper pleaded guilty to an indictment in the state courts of Massachusetts, charging them with conspiracy to conduct a business in competition with the interests of their employers, will be denied, since that fact is immaterial to the charge of unfair labor practices in respect to the seven employees here involved.

---

[14] I Wigmore, Evidence, § 2(4) (3d Ed. 1940).

[15] Willoughby v. Jamison, 8 Cir., 1939, 103 F.2d 821, 823. certiorari denied, 1939, 308 U.S. 588, 60 S.Ct. 111, 84 L.Ed. 492. "The matter sought to be brought out by the question was irrelevant. True, the complainant made such a charge in the bill, and this charge was denied in the answer; but the issue was immaterial." Fry v. Provident Sav. Life Assur. Soc., Tenn.Ch.App., 1896, 38 S.W. 116, 126, 127; accord, Ellerd v. Murray, Tex. Civ.App., 1923, 247 S.W. 631, 634.

[16] Sec. 10(e) of the Act, supra note 2.

The proffer of proof of the weather bureau records to contradict the statement of Simas that it had not rained for two weeks prior to his discharge will be denied, because that fact, even if proved, would be of little substantial weight. The company made no attempt to prove by any evidence that the bundles which Simas delivered were wet. Simas categorically denied that they were. In the absence of contradictory testimony on that fact, the mere state of the weather is too unsubstantial to constitute reversible error.

The company's petition that the order of the Board be set aside will be denied, and the petition of the Board that a decree be entered enforcing its order will be granted.

So ordered.

CLARK, Associate Justice (dissenting).

I cannot agree with the court that the Union involved in this case comes under the protection of the National Labor Relations Act. It is my opinion that Section 8(2) of the Act, as interpreted by the Supreme Court in N. L. R. B. v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 208, 84 L.Ed. 219, precludes such recognition. The original Association, predecessor to the Guild, was established by certain of petitioner's top business executives and, since company dominated, was invalid under Section 8(2). In the Newport News case the Supreme Court upheld the Labor Board's order disestablishing as a representative of the employees a labor organization which, it was undisputed, all parties were satisfied with, and under which all labor disputes had been repeatedly settled, but which was company dominated. The Supreme Court pointed out that the circuit court and the employer were of the opinion that since the employees were satisfied with the organization, that since no serious labor disputes had occurred during its existence, and that since the employees at an election had signified their desire for its continuance, it would be a proper medium which the employer might continue to recognize for the adjustments of labor disputes. Then the Supreme Court went on to say:

"The difficulty with the position is that the provisions of the statute preclude such a disposition of the case. The law provides that an employe organization shall be free from interference or dominance by the employer. * * * In applying the statutory test of independence it is immaterial * * * that any company interference in the administration of the plan had been incidental rather than fundamental and with good motives. It was for Congress to determine whether, as a matter of policy, such a plan should be permitted to continue in force. We think the statute plainly evinces a contrary purpose, * * *." As I see it, it is not the good or bad motive behind the interference or domination that is important and controlling, but whether the association or organization is company dominated. If so dominated, it is illegal per se. The independent Association was illegal at the outset, and its assimilation by the Guild did not affect this illegality. The Board, in the early stages of its administration of the Act, assumed the power to order the disestablishment of such organizations and its action in this respect was upheld by the Supreme Court. N. L. R. B. v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307. And a duty to so disestablish has been placed on the employer in such a situation. American Smelting & Refining Co. v. N. L. R. B., 8 Cir., 126 F.2d 680. See also 144 A.L.R. 463. In view of this, the Board's finding that petitioner's action discouraging membership in such illegal organization constitutes an unfair labor practice appears to me unsound.

And I think the illegality in the instant case goes far beyond that in the Newport News case. In the case at bar we have the formation of an organization by two executives for purposes detrimental to their employer. The inference is clear that these disloyal executives who had been stealing from their employer, and who have, since the instant proceedings were instigated, pleaded guilty to an indictment charging them with conspiring to engage in a business competing and conflicting with the interests of petitioner in violation of their duty to petitioner, were aware that they

were about to be caught up with and set out to organize a Union to the detriment of the company, using their company prestige as a springboard. An organization so formed has all the objections of a company dominated union, and in addition carries with it the taint of this unconscionable breach of trust by two supposedly loyal executives. A Union so tainted should not be allowed to seek protection under the Labor Act.

Since as above indicated I am of the opinion that the legality of the Association and Guild is a vital issue in the case, it follows that in my view the testimony of Dr. Myers was material to petitioner's case, and that the Board erred in upholding the trial examiner's refusal to issue a subpoena directing Dr. Myers to appear and testify.

The order of the Board should be set aside.