**NATIONAL LABOR RELATIONS BOARD v. MONTGOMERY WARD & CO., Inc.**

No. 59, Docket 22080.

United States Court of Appeals Second Circuit.

Argued Oct. 10, 1951.

Decided Oct. 29, 1951.

George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, Elizabeth Weston, and Marshall J. Seidman, all of Washington, D. C., for National Labor Relations Board.

John A. Barr, David L. Dickson, Donald W. Alfrin, and Harold W. Bancroft, all of Chicago, Ill., for respondent.

Before CHASE, Circuit Judge, and GODDARD and DIMOCK, District Judges.

CHASE, Circuit Judge.

The National Labor Relations Board found that one Victor, an employee of the respondent, had been discharged, in violation of § 8(a)(3) of the Act, 29 U.S.C.A. § 158(a)(3), because of her activity in assisting a union to organize the employees at the respondent's store in Olean, New York, and ordered her reinstated with back pay. The Board also found that the respondent had violated § 8(a)(1), of the Act, 29 U.S.C.A. § 158(a)(1), by discharging Victor as well as by interrogating other employees concerning the organizational activities of the union in the Olean store and ordered the respondent to cease and desist from so doing and to post the usual notices of its compliance. This petition to enforce the order raises two questions: (1) Whether there was substantial evidence to support the finding of the trial examiner, which the Board adopted, that Victor was discharged because of her union activity, and not for cause; and (2) whether, apart from such evidence, the inquiries made of other employees concerning the activities of the union in the store violated § 8(a)(1).

It appears that in the respondent's store at Olean there were, during the period here involved, about 38 sales people who were allocated among 26 different sections of the selling floor space, called departments. Of the 38 sales personnel, 18 were called department heads and had responsibility for one or more departments; sales girls not department heads were called "second girls" and were assigned to assist in the various departments in accordance with business requirements. Both classes of employees worked the same hours, under the same conditions except that department heads were paid more.

The discharged person in this instance had first been employed by the respondent as a sales girl on July 1, 1946. Within two weeks she was promoted to department head with an increase in pay. Subsequently, she was given two "merit increases" in pay during 1947 and two more during 1948. Victor continued to work for the respondent until June 11, 1949 when she began her regular annual vacation of two weeks. Two days later the manager hired a girl to take her place. When Victor learned of this fact, on June 22, she called the manager to inquire if that meant that she had been discharged. When told that it did, she asked for the reason but was not given any and, in fact, a false reason was entered on her personnel record.

At the hearing, the respondent introduced evidence to show that the discharge was for cause, the cause alleged consisting of an accumulation of complaints by other employees of insulting remarks made by Victor to them, of insubordination toward the assistant manager of the store, of neglect of her duties and of a decrease in her sales, though just what this last factor amounted to was not shown. Other evidence indicated that the decrease in Victor's sales might have been part of a general sales decrease or due to the transfer to another department of about 30% of the merchandise in Victor's department. Neither the trial examiner nor the Board considered the alleged sales decrease, together with the other evidence of her derelictions, to add up to more than a series of trivial incidents over a considerable period of time which, whether or not condoned by the admitted failure of the management to reprimand or warn her, would not have given rise to her discharge. The testimony of the manager of the store and of the respondent's district supervisor that they had some months before June, 1949 decided to discharge Victor as soon as a replacement could be found was not credited in view of the evidence which indicated that she was discharged because of her union activity.

The evidence relied upon by the Board was to the effect that early in May, 1949, McIntyre, a general organizer for the A. F. of L., was informed by Cummings, a brother-in-law of Victor and member of an A. F. of L. union but not an employee of the respondent, that the respondent's employees at Olean desired to join a union. Later in the month McIntyre discussed with Victor and another employee the organization of respondent's employees at the Olean store and, about a week later, Victor prepared and gave to McIntyre a list of the employees in the store. About June 1, McIntyre sent each of the employees a letter urging that they join his union and enclosed a membership application card. Victor signed and returned her card on the same day.

After that, Shaffer, a department head in the store, took her application card to the manager who looked at it and commented, "You got one." This same employee, Shaffer, had previously reported to the manager that Victor's brother-in-law, Cummings, had spoken to her about joining the union and the manager requested Shaffer to point out Cummings to him, which she later did. Another sales girl in the store, one Krott, also took her letter to the manager and told him she had received an application blank. He remarked that he didn't like the union and told her "about the proceedings of the union and about what it would mean if it was in the store" but she did not relate just what he said in that regard or the substance of it. Scordo, another sales girl, testified that about a week after she received her application blank the manager called her to his office and asked if she had received one.

When she said that she had, he said nothing about the union but told her with reference to Victor, as she phrased it, "when there is a rotten apple in the bushel, well, naturally we try to get the rotten apple out before they all turn rotten, and he said when a person has T. B. or some sort of disease they isolate them, put them into a place where all the people are the same so nobody else gets it." After the talk about Victor the manager asked the witness if she "was going to be on his side." Stuckey, another department head, testified that the manager called her to his office about a week after she received her application card and asked if she had received a union letter and card. When she replied that she had he told her, "You know what would happen if we had a union in this store. Your second girl would be making the same wages as you and that wouldn't be fair." When she said nothing to that, he added, "I want you to stay away from Mrs. Victor and her gang. I'm going to fire her if it is the last thing I do."

▮ Such evidence, which was evidently believed by the trial examiner and the Board, was what is now relied upon to show that the manager did know of Victor's union activity before a replacement for Victor was hired. There was no direct evidence that the manager knew of her activity and other employees, including her own sister, who might have been expected to know testified that they did not. So it is argued that it could not reasonably be inferred that the manager could have known of actions so secretive and, in the absence of such knowledge, the discharge could not have been because of Victor's union activities. However, there is the evidence of the manager's antipathy to the formation of a union and of his warning to employee Stuckey to "stay away from Mrs. Victor and her gang." There is no explanation in the record of just who he meant by his reference to "her gang" but, since the reference was made during a conversation in which the manager indicated his adverse attitude toward the union, it is a fair inference that he meant those who, like Victor, were known, or

believed by him, to favor the union. When that is coupled with the fact that shortly thereafter a replacement for Victor was hired, an act which was in effect her discharge, we cannot believe that it was unreasonable for the trial examiner to infer that the manager knew of Victor's union activity and that her discharge was for such activity rather than for any lawful cause. E. Anthony & Sons, Inc., v. N.L.R.B., 82 U.S.App.D.C. 249, 163 F.2d 22, certiorari denied, 332 U.S. 773, 68 S.Ct. 89, 92 L.Ed. 358; N.L.R.B. v. National Casket Co., 2 Cir., 107 F.2d 992. That being so, and taking note that the "substantiality of evidence must take into account whatever in the record fairly detracts from its weight", Universal Camera Corp v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456, we think there was substantial evidential support for the order based upon the violation of § 8(a) (3) of the Act. Granted that it was the burden of the Board to show that the discharge was discriminatory, such a permissible inference is adequate. Montgomery Ward & Co. v. N.L.R.B., 7 Cir., 107 F.2d 555; N.L.R.B. v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, certiorari denied, 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540.

▮ Such a discharge was also, of course, an interference with employee's rights guaranteed in § 7 of the Act, 29 U.S.C.A. § 157. N.L.R.B. v. Remington Rand Inc., supra. But inquiries made by the manager concerning what was being done in behalf of the union, and statements as to his not liking the union, to the extent that they constitued no threat or intimidation, or promise of favor or benefit in return for resistance to the union, were not unlawful, particularly after the 1947 amendment of the Act found in § 8(c), 29 U.S.C. A. § 158(c). N.L.R.B. v. Sandy Hill Iron & Brass Works, 2 Cir., 165 F.2d 660, 662; Sax v. N.L.R.B., 7 Cir., 171 F.2d 769. Therefore, the statements of the kind made by the manager to employees Shaffer and Krott, without more, did not violate § 8(a) (1) of the Act. And, the statements made to employees Scordo and Stuckey violated this section only insofar as the references

to Victor constituted implied threats to discharge anyone engaging in union activity.

Paragraph 1. (a) of the cease and desist order reads as follows:

"1. Cease and desist from:

"(a) Interrogating its employees as to union activities in the store; and threatening its employees with discharge or other economic reprisals because of their union affiliation, or activities."

■ It is too broad in that part forbidding mere interrogation of employees as to union activities and consequently it is modified by deleting the words preceding the first semicolon together with the "and" immediately following it.

As modified the order is lawful and the petition for its enforcement is granted.