**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MONTGOMERY WARD & CO., Inc., Respondent.**

**No. 211, Docket 24251.**

United States Court of Appeals Second Circuit.

Argued Jan. 11, 1957.

Decided March 18, 1957.

Theophil C. Kammholtz, Gen. Counsel, Stephen Leonard, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Samuel M. Singer and Florian J. Bartosic, Attys., N. L. R. B., Washington, D. C., for petitioner.

Charles J. Barnhill and David L. Dickson, Chicago, Ill., and T. W. Madden, New York, N. Y., for respondent.

Before CLARK, Chief Judge, and LUMBARD and WATERMAN, Circuit Judges.

LUMBARD, Circuit Judge.

The National Labor Relations Board petitions this court for enforcement of its order of February 29, 1956 that Montgomery Ward (1) cease and desist from (a) discouraging its employees from union membership, by discriminatory hire, discharge and reinstatement; (b) interrogating employees about their union membership, activities or views, and (c) interfering in any manner with their rights to self organization and collective bargaining, in violation of § 8(a) (1) and § 8(a) (3),[1] National Labor Relations Act, 29 U.S.C.A. § 158; (2) reinstate employees Frank Felker and Irene Witter, whom the Board found to have been discharged for union activity in violation of § 8(a) (3); and (3) post the usual notices of compliance. In its decision, the Board also found that Montgomery Ward had interfered with, restrained, and coerced its employees in violation of § 8(a) (1) by store manager Rumble's questioning of certain employees as to union activity.

The central issue in this case is the motive for the discharge of Frank Felker and Irene Witter. The Board, affirming the Trial Examiner, found that the discharge was for union activity, and rejected Montgomery Ward's claim that it was for reasons of efficiency and economy.

We grant enforcement of the Board's order as the record discloses substantial evidence to support the findings of the Board.

In addition to its mail order business, Montgomery Ward operates many retail stores, including one in Binghamton, New York. A basic store chart sets up the organization of each store. The store manager may hire extra or temporary help only to the extent of sales above a "basic" amount. The Trial Examiner found that the "basic" for the Binghamton store was revised twice a year; the revision most pertinent to this case is that of July 1954.

Felker, an excellent salesman who had won numerous prizes and rewards from the company, had been with Montgomery Ward from 1942 to the date of discharge except for a brief period in 1953 after which he returned to his former position at an increase in salary. He was in charge of the farm equipment department of the Binghamton store at the time of his discharge; on July 1 he was asked to take over the toy department as well.

Witter had no fixed assignment but helped out in various departments of the store, working in about twenty different capacities at one time or another. She worked steadily for Montgomery Ward from 1950 until her discharge on August 19, 1954, two days after the election.

In June 1954, Retail Clerks International Association, Local No. 1687, AFL, started to organize Montgomery Ward's Binghamton store, filed a petition for certification on July 16 and in an election on August 17, succeeded in becoming the bargaining representative. Felker and Witter, the two discharged employees, were strong advocates of the Union. Both solicited members, particularly during August at the height of the union organizing campaign. Felker was a particularly active solicitor, going so far as to advance money to one fellow-employee to enable him to join the Union.

A few weeks prior to the election, a department head named DuFour, who

[1]. Sec. 8. "(a) It shall be an unfair labor practice for an employer—
"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;
　*　　*　　*　　*　　*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *"

at the hearing admitted his strong anti-union sentiments, told Felker that "the Company knows all of those that (sic) are in favor of the Union and they will lose their jobs." At another time he told Felker that if the Union won, Montgomery Ward would close the store. DuFour also told Witter that if the Union won, she would lose her job because of her union activities. About two weeks before the election, he told an employee named Bright that the company knew who the union people were, and that if the Union won, certain people including Felker, would be automatically squeezed out. This could be done, DuFour is reported by Bright to have said, by "put-[ting] two jobs—two departments together and eliminate that job."

In addition several other employees testified that store manager Rumble asked them whether they had joined the Union.

On Monday, August 16, Felker started a week's vacation, but returned on August 17 to vote in the election. On his return to work on August 23 he was told that he had been discharged by order from the New York office. In place of his $70 a week position he was offered a part-time job at $20 a week which offer he refused. About ten days later Felker asked for his dismissal pay from store manager Rumble who said he could not give it to him, adding "Frank, I hope you don't hold anything against me. As far as I am concerned, there was nothing wrong with your work."

Four days after Felker was discharged Montgomery Ward advertised for "full or part-time help." About a month after the discharge, Montgomery Ward hired a replacement for Felker at $50 per week plus commissions.

Montgomery Ward dismissed Witter on August 19, two days after the election. The day of Witter's dismissal, Du-Four had commented on the fact that she was wearing a union button and said, "I wouldn't have anything to do with the Union or anybody in it, if I were you." At 6:00 that evening, she was told she was being released because she was on a "non-basic payroll" and couldn't be carried any longer, presumably because the store was not earning enough over the basic requirements. Store manager Rumble later testified she was discharged because her work was unsatisfactory. About two weeks after her discharge Montgomery Ward hired a replacement for Witter.

In explanation of the discharge of Felker, Montgomery Ward contended that some time between March and June it had been decided by the regional operating manager and the district manager that the farm equipment and toy departments should be combined with the paint department, because it was concluded that the sales for the farm equipment department during the coming half-year would fall off. This amalgamation eliminated one department head and the Company claimed it was necessary to choose between McGraw, who headed the paint department and Felker. Since McGraw was a better all-around man, the Company decided it would discharge Felker, who was earning $70 per week plus commissions, and retain McGraw at $60 a week, allowing him an extra $20 a week out of basic for a part-time man.

The Company explained Witter's discharge on the ground that it was necessary to reduce the payroll and that Witter's shortcomings as an employee made her the appropriate person to cut.

The Trial Examiner found that Felker and Witter had been discharged not because of the revision in the basic store organization, but for their union activities. He also found that Rumble's questions as to union membership constituted an interference with the exercise of employee rights under § 7, in violation of § 8(a) (1), and that DuFour's questions and threats constituted coercion, also in violation of § 8(a) (1).

The Board affirmed the decision as to Rumble, but held that because DuFour had voted in the representation election, he was probably considered by the employees as one of them rather than as part of management. Hence, DuFour's statements to them could not be consid-

ered as management coercion. However, the Board held that despite his voting in the election, his supervisory status could be considered in determining whether his knowledge and attitude could be imputed to Montgomery Ward in determining the motivation for the discharges. The Board thereupon found that he was a supervisor with power to hire and fire.

■ Montgomery Ward argues that a finding of a § 8(a) (3) violation requires a specific finding as to the motive of the supervisory employees who actually did the firing and that in making this finding, DuFour's knowledge, attitude and statements could not be considered. If DuFour's role be disregarded, Montgomery Ward contends the Board's other findings fail to sustain its order.

Montgomery Ward rests its case against the use of DuFour's statements to establish its motive on two grounds:

1. The Board had held that because of DuFour's membership in the unit and his participation in the election, Montgomery Ward would not be held responsible for DuFour's anti-union statements so as to hold the company liable for violation of § 8(a) (1). It was therefore inconsistent to impute DuFour's knowledge and actions to the company to show a violation of § 8(a) (3).

2. By agreement of the Union and Employer, and with the approval of the Regional Director of the National Labor Relations Board, DuFour was included in a unit of all employees except supervisors and voted in the election. The Board was therefore estopped from considering him as a supervisor and imputing any of his activities to Montgomery Ward.

We do not agree with these contentions.

We find nothing inconsistent in the Board's decision that DuFour's statements could not be used to charge Montgomery Ward with coercion and intimidation in violation of § 8(a) (1) but could be used to determine Montgomery Ward's knowledge and attitude. The Board's theory that no § 8(a) (1) charge could be grounded on DuFour's questions and threats was based on the fact that he was considered by the employees as one of them and not part of management. "Thus, [his statements] do not tend to intimidate them." These subjective employee reactions have no bearing on whether he actually was an agent of management, for he could easily have been very high in management circles without the other employees having any notion of this. DuFour's supervisory status is clear, and, regardless of how the employees reacted to DuFour's statements, his knowledge of union activities and statements as to employer motivation were properly imputed to Montgomery Ward.

■ Moreover, as the Board rightly concluded, the fact that DuFour was included in the bargaining unit and voted, with the approval of the Union and N. L. R. B. Regional Director, does not estop the Board from considering his supervisory status, for neither the Board nor the Regional Director ever made a definitive determination of his status. The Regional Director merely approved the arrangement for the election as agreed to by the Union and the employer. It is most unlikely that such approval either did, or even could as a practical matter, involve any careful study of supervisory status. In many prior cases before the Board, it has held that it will not be estopped from inquiring into supervisory status by the approval of one of its Regional Directors, see, e. g., The Steel Products Engineering Co., 103 N. L. R. B. 565, 576 (1953); Valentine Sugars Inc., 102 N.L.R.B. 113, 114 n. 3 (1953). This position seems to us to be entirely sound, especially where the fact and effect of voting have no necessary connection with the issues in the Board proceeding—as noted supra, the fact that DuFour voted in the election has no necessary connection with his also being an agent of management for purposes of § 8(a) (3). N. L. R. B. v. Jas. H. Mathews & Co., 3 Cir., 1946, 156 F.2d 706, 708–709, cited by Montgomery

Ward, is thus distinguishable for there the employer was charged, inter alia, with coercion in violation of § 8(a) (1). On that issue, the Board found, as in the case now before us, that the supervisory employee's participation in the representation election was relevant in determining whether the other employees would consider the supervisor's statements as an attempt at employer coercion. Thus to hold that the Regional Director's approval estops the Board would be to ignore the realities of the situation.

 Nor can the agreement between the Union and Employer preclude either the Board from examining an employee's supervisory status, or the Union from bringing a complaint for discriminatory discharge based on such a supervisory employee's knowledge and expression of employer attitudes. Brewster Pateros Processors, 73 N.L.R.B. 833, 834–35 (1947). Again, the fact that a supervisory employee votes in an election is not conclusive on the question of whether he is "an arm of management" in determining management's knowledge and motivation in a § 8(a) (3) proceeding, and whether the Union consented to his voting is immaterial.

But the Board's finding of Montgomery Ward's motivation for the discharges does not rest solely on the evidence concerning DuFour's knowledge of Union activities and statements of employer intention which we find the Board is at liberty to impute to the company.

There was other evidence in the record to support the Board's refusal to adopt the explanation for the discharge adduced by the company.

 As to Felker, Montgomery Ward contends that in July it was decided that Felker's and McGraw's departments were to be combined and that since Felker was an unsatisfactory employee, Felker was to be dismissed. There was also testimony by Levengood, Montgomery Ward's district manager, that in March,

Montgomery Ward decided to replace Felker because he was unsatisfactory. But in July, Felker was asked to head the toy department. If his work was so unsatisfactory that his discharge was contemplated as early as March and decided upon in July, it seems unlikely that he would be assigned to head another department in early July. Nor does any notice or warning of discharge seem to have been given. The abruptness of a discharge and its timing are persuasive evidence as to motivation, see E. Anthony & Sons v. N. L. R. B., 1947, 82 U.S.App.D.C. 249, 163 F.2d 22, 26–27. As to Montgomery Ward's allegations that Felker was incompetent, it is undisputed that he was an outstanding salesman. The flaws in his work as department head on which Montgomery Ward purports to rely, were carefully considered by the Board, which concluded that there was little substance to them. With this we agree.

 Finally, if the purpose of Felker's discharge was to save money, it is difficult to understand why an advertisement for employees was inserted just a few days after the discharges, and why a new employee was soon hired to replace an outstanding salesman like Felker at a salary only $20 lower.

As to Witter, the suddenness of the discharge immediately after the election and the almost immediate replacement support the Board's finding. Montgomery Ward urges many instances of incompetence; none of them seemed to have any but a very slight basis.

Finally, the Board's finding that store manager Rumble's questioning of the employees regarding their Union affiliations constituted sufficient interference in the particular factual setting of this case to charge Montgomery Ward with a violation of § 8(a) (1), is warranted by the record.

We conclude that the Board's order is supported by substantial evidence and should be enforced.