**FEDERATION OF UNION REPRESENT-
ATIVES, Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent,**

and

International Ladies' Garment Workers' Union, AFL–CIO, Intervenor.

**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**INTERNATIONAL LADIES' GARMENT
WORKERS' UNION, AFL–CIO,
Respondent.**

Nos. 407, 408, Dockets 28558, 28598.

United States Court of Appeals
Second Circuit.

Argued June 10, 1964.

Decided Nov. 20, 1964.

Sanford M. Katz, New York City, for Federation of Union Representatives.

Emil Schlesinger, New York City (Julius Topol, New York City, on the brief), for International Ladies' Garment Workers' Union.

Robert G. Sewell, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Warren M. Davison, Atty., N. L. R. B., on the brief), for National Labor Relations Board.

Before FRIENDLY, SMITH and MARSHALL, Circuit Judges.

SMITH, Circuit Judge.

In ILGWU v. N. L. R. B., 339 F.2d 116, 2 Cir., a representation proceeding, in an opinion filed today, we upheld the Board's determination in 131 NLRB 111 that International Ladies' Garment Workers' Union (ILGWU), itself an international labor organization, is an employer of employees and engaged in commerce within the meaning of the National Labor Relations Act, 29 U.S.C. § 151 et seq. The present unfair labor practice case grew out of the efforts of Federation of Union Representatives, known as FOUR, to organize business agents, organizers, educational directors and other personnel in union label and political work in the employ of ILGWU. The structure and history of ILGWU and the make-up and organization of FOUR are fully set forth in the opinion in the representation proceeding. The complaint in the instant case was based on charges that the employer ILGWU engaged in unfair labor practices in violation of § 8(a) (1) and (3) of the Act by interrogations, threats, discriminatory transfers and discharges, reduction of allowances, increase of job duties, withholding of customary wage increases, establishment of a grievance and other committees and promise of benefits to encourage the use of the

committees. The Board held the discharges and reduction in allowances not discriminatory, but found coercion to induce employees to renounce FOUR by interrogation, solicitation, threats, creation of a grievance committee and by withholding customary wage increases.

FOUR petitions to review the finding that the discharge of one Constantine Sedares was not as a result of union (FOUR) activity. The Board petitions for enforcement of its order, including back pay on the wage increase withholding.

We find no error in the ruling as to Sedares, and dismiss FOUR's petition for review. We find no error in the ruling as to the wage increase withholding, and will enforce that portion of the Board's order. We find no substantial support in the record as a whole of the other findings of coercion and decline to enforce the Board's order in those respects.

I

■■■ If Sedares was discharged partly because of participation in the campaign to establish FOUR and partly because of some neglect or delinquency, a violation of the Act would be made out. N. L. R. B. v. Jamestown Sterling Corp., 211 F.2d 725, 2 Cir. 1954, N. L. R. B. v. Great Eastern Color Lithographic Corp., 309 F.2d 352, 2 Cir. 1962. The record, however, supports the finding that the discharge was solely for cause, and not in any respect because of participation in the FOUR campaign.

■■■ It is amply established on the record that Sedares, although possessed of considerable ability, was a headstrong, and at times insubordinate union organizer. He was graduated from the ILGWU Training Institute in June 1958. Thereafter he worked for the ILGWU in the Upper South Department, the Northeast Department, the Dressmakers' Joint Council, and from March 1960 until his eventual discharge December 9, 1960 with the Eastern Region. Kramer, a vice president of the ILGWU was General Manager of the Eastern Region. An organizing campaign was in progress at Tiny Town Togs in Troy, New York under Walter De Young. Early in October Sedares was placed in charge of this campaign under De Young when De Young was needed in another organizing campaign. Sedares was told to clear leaflets and major expenses with Kramer. The ILGWU was successful in the election, but thereafter it was found that Sedares had run up an unauthorized bill of $250 for a dinner during the campaign, and without authorization had offered to pay the Tiny Town employees for time lost in voting at the off-plant election. He had yelled at Nash, manager of the Troy local, kicked over a chair and stormed out of the room when Nash attempted to open negotiations with Tiny Town after the election results were known. It was found also that Sedares had been rude to the clerical staff in the Newburgh office and had left an insulting note for the manager of that office. Kramer, checking on Sedares' conduct, had difficulty getting in touch with him, but finally saw him on November 30, De Young and Kramer's assistant Janis also being present. After discussing the complaints against Sedares, Kramer told him he was discharged. De Young, however, prevailed upon Kramer to give Sedares another chance at Newark, N. J. under one Detlefsen. Kramer agreed and returning to the room where Sedares was, told him he would be given a last chance, at Newark under Detlefsen. Sedares went to Newark. Detlefsen soon became annoyed at Sedares' attitude and failure to obey instructions in reporting to the office, and before the end of the week called Kramer and asked him to take Sedares back. Kramer, however, told Detlefsen to inform Sedares that Kramer's instructions were to discharge Sedares. Detlefsen then wrote a letter to Sedares informing him of his discharge. On receipt of the letter Sedares on December 13 went to see Detlefsen and was told he was discharged because he was not fitting into Detlefsen's team. On December 14 Sedares went to see Kramer to find the "real reason" for his discharge and accused Kramer of firing him for union

activity. The examiner and the Board found that Kramer had not at that time heard anything about union activity among staff members. Sedares had for some time been active in the group planning the formation of a staff union, which was formally organized as FOUR at a meeting in New York on December 11. De Young knew of the plans at least by November 22, but did not inform Kramer of them. The finding by the examiner of lack of knowledge by Kramer at the time of the firing and rehiring of Sedares on November 30 and his final discharge on December 9 is borne out both by Kramer's rehiring of Sedares on the 30th and by Kramer's reaction in apparent surprise to Sedares' accusation on the 14th. Moreover, the finding as to lack of knowledge of Sedares' union activity by Kramer and Detlefsen at the time of the firing is based partly on the examiner's assessment of the credibility of the witnesses who testified before him. Such matters are peculiarly within the province of the trier of the facts. N. L. R. B. v. Walton Mfg. Co., 369 U.S. 404, 407–408, 82 S.Ct. 853, 7 L.Ed.2d 829, N. L. R. B. v. Marcus Trucking Co., 286 F.2d 583, 590, 2 Cir. 1961. We would not be justified in upsetting his finding, accepted by the Board, merely because of the coincidence of the dates, suspicious as that may be. The finding must stand and it is dispositive of the issue of discriminatory discharge. The employer acted in the firing solely through Kramer and Detlefsen. De Young's knowledge was found not to have been communicated to them. FOUR contends that De Young's knowledge is that of the ILGWU. This, however, does not follow in any sense meaningful here. What we seek to determine is the cause of the firing. Knowledge by De Young or anyone else in the ILGWU not communicated to Kramer or Detlefsen, the sole actors in the firing, obviously could not have been a cause of the firing. FOUR's petition

for review with respect to Sedares' discharge must be denied.

II

In addition to the discriminatory discharge claims, conduct of ILGWU after the existence of FOUR became known was claimed to be coercive in violation of § 8(a) (1) and (3) of the Act. It consisted of interrogations, conversations between supervisory personnel and staff members about the formation and desirability of a staff union, the formation of committees on grievances, wages and other matters and suspension of usual staff wage increases.

There is no question but that the management of the employer, ILG WU, was shocked and upset by the development of the staff union, and argued eloquently and at length against it. This in itself, however, does not establish a violation of the Act. Mere expressions of views, argument or opinion are protected by § 8(c) of the Act.[1] N. L. R. B. v. United Steelworkers of America, CIO, et al., 357 U.S. 357, 362, 78 S.Ct. 1268, 2 L.Ed.2d 1383 (1958). The official position taken by the employer was that there should be no discrimination in any way because of membership in or advocacy of FOUR. There is no determination that this position was not taken in good faith by Dubinsky, President of ILGWU, and the examiner in the face of earlier disavowals by the General Counsel declined to consider a later claim of unlawful conduct by Dubinsky. However, there may be a violation even though bad faith is not established if the effect of management's actions is necessarily coercive. We do have a situation here in the suspension of the automatic wage increases pending action of the General Executive Board of the employer on the relationship with FOUR, which was necessarily coercive, regardless of the good faith of the employer. ILGWU explains the action as prompted by fear of unfair

---

1. The expressing of any views, argument, or opinion, or the dissemination thereof whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

labor practice charges based on any unilateral wage increase. Whatever possibility of accusations of discrimination there might have been in case of merit increases, no such possibility existed as to increases automatic as to time and amount, and their suspension pending determination of the relationship was inherently coercive. Had the merit increases alone been withheld, the action, if properly explained, might well have been held not coercive. Since their withholding was coupled with the unjustified withholding of automatic increases, however, the Board was justified in holding the entire wage increase withholding action coercive. The Board's order based thereon must be enforced.

■ We find a different situation, however, as to the findings of coercion by the employer in other respects by interrogations and solicitations of withdrawals from FOUR. On the record as a whole we find that the Board's conclusion that these were coercive in intent or effect is not supported by substantial evidence, and deny enforcement of the portion of the Board's order based thereon.

The interrogations on learning of staff union activity, on which the finding of violation of the Act is in part based, were as follows:

On December 14 Kramer first learned of the effort to organize the staff through a claim by Sedares that he had all of Kramer's organizers signed up, and reported the conversation to General Secretary Stulberg, who said he did not believe it, but that they should look into it. Kramer interrogated Bramucci, his education director, on December 14, Bernard Cohen on the 15th about the men organizing. Rona, State Supervisor of ILGWU at Fall River, asked Fontaine and Leshyk, of the Fall River staff, around mid-December of their knowledge of FOUR and membership in it. Shore, State Supervisor in Pennsylvania, at the request of Chaikin, Manager of the Northeast Department, asked staff people what they knew about FOUR. After a call from Shore, Rosato of the Shamo-

kin local asked Haugh, a business agent, if she had joined FOUR and whether the other business agents, Krepshaw and Crowley, had done so.

Cerbone, manager of the Jamaica office of the ILGWU, on receiving a report around December 15 or 16 that Morton of his staff had received an application card from FOUR, asked Manenti, Kaufman, Taylor and Koozman of the staff what they knew of FOUR and whether they had signed for it. When Manenti said he intended to sign, Cerbone reminded Manenti that Cerbone had sent him to the Training Institute, and said he wasn't to be trusted. When informed that Rogoff was a leader of FOUR, Cerbone told Kaufman and Koozman that he thought Rogoff had more sense, that Sedares was just a "bum" and that if they were smart they would get out of FOUR. He also told his staff that in his opinion it was a violation of the ILGWU constitution to be a member of FOUR and that it constituted dual unionism. On another occasion he informed them that he did not "give a damn" whether they joined FOUR or not.

Kramer reprimanded Koozman for engaging in an altercation in the office, questioned him as to his reasons for joining FOUR, agreed with him that it would probably be a long drawn out business, and told him the ILGWU felt so strongly about the issue whether its business agents were its officers or its employees that it would take the issue to the highest court.

■ Aside from Cerbone's remarks, none of the miscellaneous interrogations passed permitted limits. They merely sought information and expressed opposition. While some of Cerbone's statements taken alone may be given a sinister meaning, his final reaction that he did not "give a damn" is borne out by the lack of any showing of discrimination against the FOUR members to whom he talked. They were in any case only remarks by one local manager in the face of the announced official policy of non-discrimination, carried out in practice. Interrogation is not coercive, un-

less the surrounding circumstances, taken as a whole, show that the interrogators threatened discrimination against those engaged in union activity or promised reward for opposition to such activity. N. L. R. B. v. Montgomery Ward & Co., 192 F.2d 160, 163, 2 Cir. 1951. The employees interrogated were not new to the concept of union organization and the right to be free from coercion. In this setting we see no substantial evidence of threat or promise, express or implied.

Dubinsky on December 29 informed all regional directors of FOUR's demand for recognition, stated that it was a matter for the General Executive Board, which had a meeting scheduled for January 30, and postponed the annual review of wages pending action at the meeting.

Sedares and Rogoff asked a meeting with Dubinsky, complaining of the discharge of Sedares, threats of other discharges, systematic interrogation and threats of reprisals. Dubinsky replied that only the General Executive Board could act and stated his certainty that the Board would hear any individual or committee that wished to appear on the matter. On January 9 Rogoff and Sedares met with President Dubinsky, General Secretary Stulberg, and Daniels of the ILGWU. The only specific claim of discrimination made was that of the discharge of Sedares. Dubinsky agreed to and did send a letter to all regional directors stating that a question of discrimination had been raised, that to his knowledge there had been none and that the policy of non-discrimination should be adhered to.

The General Executive Board met January 30, rejected FOUR's request for recognition and set up three committees, one on grievances, wages and other personnel problems, one on whether to continue staff people on the ILGWU payroll or distribute them to departments, regions and locals, the third to consider whether to continue to allow Training Institute graduates to become ILGWU members after one year and members of its retirement fund after 3½ years.

Regional staff meetings were held by Kramer for Eastern Region personnel, by Chaikin for Northeast Department personnel, and by Kehrer for Southeast Region personnel. On February 17 at the Eastern Region staff meeting, Kramer told the staff that the issue of FOUR was one the ILGWU and himself felt very strongly about, that ILGWU was not an employer and they weren't employees, that it was not a business, but a movement. Some of the managers attacked FOUR's adherents as creators of an internal faction who ought to be kicked out of the union, a position which Kramer himself disavowed, as vicious for not keeping their grievances within the union, but going to the press, and for going to an outside organization. Kramer named those he thought were members of FOUR and pointed out that two others, members of the ILGWU, had once been communists, had seen the light, and returned to the fold and to union office. Dubinsky spoke of this also, and promised FOUR a long hard fight up to the Supreme Court.

February 20, at a meeting of the Northeast Department staff, Chaikin outlined the grievance procedure to be set up and debated the merits of FOUR, contending the trade union movement was a cause rather than an employer in the usual sense.

January 3, February 13 and 17 meetings were held of the Southeast Region staff. At the first meeting, Kehrer did not speak, pending policy determination at the GEB meeting, but some speakers attacked FOUR. At the subsequent meetings Kehrer denounced FOUR.

These staff meetings were periodic affairs for the discussion of ILGWU problems. The formation of a union within the union was recognized by FOUR as involving a number of issues, which indeed FOUR itself stated and argued in its literature addressed to those it sought to enroll. So long as there were no threats or promises to interfere with FOUR's organization, these debates, even though heated, are within the protection of § 8(c). Kehrer's comments

at the later Atlanta meetings may come close to the line, but taken in the setting of the entire picture and especially of the adopted policy of non-discrimination, we think them insufficient to constitute substantial evidence of coercion by ILGWU.

Besides the meetings, individual solicitations are under attack.

On February 25 Chaikin invited Rogoff, FOUR's secretary-treasurer, who was attached to Chaikin's department, to his home for an overnight visit, during which FOUR, its relationship to its members and to ILGWU was discussed until 3:00 a. m., at which discussion Chaikin reminded Rogoff that Chaikin once recommended Rogoff for a promotion and said or implied that he would never do so again because Rogoff was stupid. Roberts, district manager of the Southern New England District, attended the February 20 meeting and subsequently separately called in Roussos, Leshyk and Fontaine, business agents under Roberts, and solicited their resignations from FOUR. Roussos and Fontaine refused, Leshyk eventually complied. Rona, supervisor of upstate New York and New England, also attended the February 20 meeting. Klitzman, one of Rona's business agents, asked Rona how gracefully to get out of FOUR. Rona suggested Klitzman tell a regional meeting of FOUR how he felt and "why not take advantage of the grievance and financial committees set up by the GEB on January 30." Rona made similar suggestions to Roussos. Klitzman made the suggested statement at the FOUR meeting suggesting that the grievance procedure set up by the GEB be used.

Rosato, manager of the Shamokin local, asked one Krepshaw and one Haugh to resign from FOUR. Haugh finally agreed to resign and Rosato dictated the telegram to be sent.

Kehrer, after the Southeast Region meetings, interviewed business agents Gross and Warren and organizers Temple, Sharp and Stafford briefly about FOUR, asking Warren and Temple to withdraw.

The importance of Chaikin's remarks, in the long evening discussion with Rogoff, has been exaggerated out of proportion. Chaikin and Rogoff both knew of Dubinsky's general instructions, and that he would not stand for discrimination. Chaikin's statement that Rogoff's disagreement with him on the desirability of such a union as FOUR was evidence of stupidity which would prevent him from again recommending Rogoff for promotion, in the setting of such a debate savors more of heated advocacy than genuine threat. Roberts' and Rona's solicitation of resignations from FOUR were unaccompanied by threats or promises. Haugh obviously did not consider Rosato's interrogation coercive, as she testified (Tr. 1713) "Well, sir, you would have to know Mr. Rosato and I. We can be friends one minute. We will argue a little bit the next, and five minutes afterward we are friends again."

It is true that feelings were high, and the dispute as to the nature of the relationship was emotional. However, the official position was against discrimination. Evidence of reprisals is lacking. Indeed, quite the opposite is found in Temple's case. Kehrer gave him extremely generous treatment in a time of injury and illness after the alleged threats.

It may also be noted that ILGWU was not opposed in principle to unionization of those it considered its employees, and dealt with unions representing its clerical, janitorial and similar help. It was willing, in fact, to deal with a union representing some of those FOUR was seeking to organize, that is, its organizers, although strongly opposed to organization of its business agents.

Of 92 regional directors and district managers, three, Rosato, Cerbone and Kehrer, were alleged and found to have warned or threatened staff members, without, we think, substantial evidence on the record as a whole.

We conclude that on the record as a whole, substantial evidence of violation by ILGWU is lacking except in the withholding of pay increases. Enforcement is granted only of so much of the order as proscribes the failure to

grant automatic annual and/or merit wage increases to its employees, in accordance with its past practices, because of FOUR's recognition request, and ordering ILGWU to make whole its employees for loss of earnings suffered as a result of the unlawful withholding of automatic annual and/or merit increases in the manner set forth in the Decision and Order. (Revised paragraphs 1(f) and 2(c)). The Notice will be revised accordingly. The extent of back pay due, in view of a larger than usual increase on July 1, can be determined in compliance proceedings.

