**BAUER WELDING AND METAL FAB-RICATORS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 18166.**

United States Court of Appeals
Eighth Circuit.

April 14, 1966.

Thomas M. Vogt of Felhaber, Larson, Fenlon & Vogt, St. Paul, Minn., made argument for the petitioner and filed brief with John W. Edstrom, St. Paul, Minn.

George H. Cohen, Atty., N. L. R. B., Washington, D. C., made argument for the N. L. R. B. and filed brief with Arnold Ordman, Gen. Counsel, N. L. R. B., Dominick L. Manoli, Associate Gen. Counsel, N. L. R. B., and Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Allison W. Brown, Jr., Atty., N. L. R. B., Washington, D. C.

Before VOGEL, Chief Judge, BLACK-MUN, Circuit Judge, and STEPHEN-SON, District Judge.

VOGEL, Chief Judge.

We are concerned here with a petition to review and set aside an order of the National Labor Relations Board (hereafter Board), respondent herein, under § 10

(f) of the National Labor Relations Act (hereafter Act) as amended, 61 Stat. 136, 73 Stat. 519, 29 U.S.C.A. § 151 et seq. The Board makes cross-application for enforcement of its order, which is reported at 154 NLRB No. 82. The Board, substantially adopting the Trial Examiner's findings, conclusions and recommendations, has found petitioner to be in violation of § 8(a) (1), (2) and (5) of the Act.[1] No jurisdictional issues are involved.

Petitioner is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. It is engaged in the business of metal fabrication, specializing as a job shop doing commercial welding and tube bending.

In May of 1964 the Sheet Metal Workers Local Union No. 547 (hereafter Union), through its local business representative, Kenneth L. Johnson, began efforts to organize the employees of petitioner after having been contacted by Desmond Zahn, one of the employees. With the exception of the personal contact with Zahn, Johnson, having obtained from Zahn a list of most of the names of petitioner's employees and their addresses, conducted the Union's organizational campaign entirely by mail. On May 19, 1964, Johnson sent an authorization card, a covering letter and a pamphlet designed to demonstrate the benefits of union representation to 18 of the 23 employees of petitioner who eventually voted in the representation election. Because of the language used in the covering letter and its importance in the determination of

this review, we set forth the letter in full as follows:

"SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION

Local Union Number 547
Offices: Room 302—
117 S. E. 4th Street
Minneapolis 14, Minn.

"To All Employees of Bauer Welding and Metal Fabricators Inc.:

"Dear Friends:

"YOU CAN HAVE A UNION IN YOUR PLANT IF YOU WANT ONE!

"Just fill out the enclosed authorization card and return it to us. The card will then be turned over to the National Labor Relations Board, a branch of the United States Government.

"This is your right under the law. The National Labor Relations Board will then conduct an election in your plant by secret ballot.

"However, the United States Government will conduct an election *only* if we show them that the employees have asked us to represent them. *Your employer will never see these cards*.

"If the majority of the employees vote to be represented by the Union, the United States Government will then certify the Union as the bargaining agent for the employees.

"The Sheet Metal Workers' Union understands your problems and is standing by ready to help you. The sooner we get the cards back, the sooner Uncle Sam will conduct an election in your plant, and we will be able to help you.

---

1. § 8(a) (1), (2) and (5) of the Act, 29 U.S.C.A. § 158(a) (1), (2) and (5) provides in pertinent part:

"§ *158.  Unfair labor practices*

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [dealing with the employees' rights to self-organization and collective bargaining];

"(2) to dominate or interfere with the formation or administration of any labor organization or contribute finan-

cial or other support to it: *Provided,* That subject to rules and regulations made and published by the Board * * * an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

\* \* \* \* \*

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title [dealing with the identity of the bargaining unit]."

"You will choose your shop stewards and negotiating committee. The Union will work with you to negotiate your own Union contract and wages and working conditions you will not be ashamed to work under.

"REMEMBER—Together we stand united—alone the Company owns you! BELONGING TO THE RIGHT UNION DOESN'T COST—IT PAYS!

Yours fraternally,

kj w     KENNETH L. JOHNSON

oeiu#12 Business Representative

enc.     Local Union No. 547

5-19-64"

(Capitalization and emphasis in the original letter.)

By May 26, 1964, 15 of the eligible employees for the proposed bargaining unit had signed and returned the authorization cards to the Union. No other employees signed a card after that date. On that date a second letter was mailed to the employees notifying them that the Union would hold a special meeting at its headquarters on Tuesday, June 2, 1964, at 7:00 p. m. in order to "answer all your questions about this Union, collective bargaining and the process of a Union election conducted by the United States Government". The letter in its entirety is as follows:

(Letterhead omitted)

"May 26, 1964

"To Employees of Bauer Welding and Metal Fabricators, Inc.:

"Dear Friends:

"There will be a special meeting for employees interested in higher wages, better working conditions and other fringe benefits.

"These improvements can be attained through collective bargaining by your Union, the Sheet Metal Workers' Union, Local No. 547.

"Meeting time—7 P.M.—Tuesday, June 2, 1964

"Place—Room 302—Minneapolis Labor Temple, 117 S. E. 4th St., Minneapolis

"Come to this special meeting and we will answer all your questions about this Union, collective bargaining and the process of a Union election conducted by the United States Government.

"If you haven't sent your authorization card back, do so now, so we can make it 100% for the Union. Do not engage in conversation about these matters at this time in your plant.

"See you at the meeting!

Yours fraternally,

kj lw     KENNETH L. JOHNSON

oeiu#12 Business Representative

Local Union No. 547"

Donald K. Bauer, president of petitioner, first learned of the Union's organizing activities on or about June 1, 1964, from an employee, Steve Swiderski. Swiderski had learned of the Union activity from a fellow employee. In the erroneous belief that Swiderski was a supervisor, the Union had not solicited him at the same time it contacted the other employees.

On Tuesday, June 2, 1964, Bauer called a mandatory meeting of his employees. The meeting was scheduled for 5:55 p.m. so as to include both shifts then operating at the plant. The employees were paid overtime for attending the meeting and food was served. The meeting was held behind locked doors, a procedure never before used. Bauer spoke to the employees, stating, inter alia, that he had "heard through the grapevine there was going to be this union meeting at the Labor Temple that night" and that he "did not want to keep [the employees] from it". He nevertheless detained all of his employees until 6:50 p.m., at which time it would have been inconvenient for them to attend the 7:00 p.m. meeting at the labor temple, located about 20 minutes away from the petitioner's plant. The result was that only three employees appeared at the Union meeting and they arrived late.

At the meeting at petitioner's plant Bauer spoke of "sweetheart contracts"— i. e., contracts not in the employees' best interest which are sometimes entered into between dishonest union officials and management—advising his employees that he, too, "could negotiate one just as well as anybody" and that when he did the employees would be none the wiser.

In speaking of the Union business representative, Johnson, Bauer said he "could tell [them] a few things" about Johnson but that he would not do so. After asking his employees if they knew anything about Johnson, Bauer said, "Do you want to have this man represent you? * * * I do know of him but I will not mention anything about it." However, at the hearing before the Examiner, Bauer admitted on cross-examination that he did not know Johnson, saying, "I was wrong in that statement."

Bauer also talked to his employees about the benefits they already enjoyed without collective bargaining, referring to such things as a week's sick pay, holiday pay and coffee breaks. He told them that if they chose the Union to represent them, bargaining would have to "start from scratch" with respect to these benefits. He stated that if the Union came in, petitioner might discontinue the profit-sharing plan under which employees supplemented their regular hourly earnings by quarterly bonuses for completed jobs. He referred to petitioner's policy whereunder employees were transferred to other available work when their own particular work ran out and advised that if the Union came in the work would be "stratified" so that employees would be laid off instead of reassigned to other work. He emphasized that the Union could not secure any benefits for the employees and then asked, "How long could you people afford a strike?"

Commencing on Wednesday, June 3, 1964, and continuing sporadically throughout that week and thereafter, Bauer talked to employees individually and in groups at their work stations on company time. He reiterated the statements made at the mandatory June 2, 1964, meeting. Bauer showed some of the employees photostatic copies of payroll checks and told them that the signatures did not match those on the authorization cards held by the Union. Such charge had no factual basis as Bauer had at that time not seen the authorization cards.

On June 4, 1964, David Roe, a Minneapolis Union official, and Johnson came to petitioner's plant. Johnson introduced Roe and himself to Bauer. Johnson stated that the Union represented the employees and that he and Roe wished to discuss this with Bauer. Bauer stated that he was too busy and immediately took leave of his visitors. Johnson then sent out the following letter, making a demand that the Union be recognized as the bargaining agent of petitioner's employees, which Bauer received on the morning of June 5, 1964:

(Letterhead omitted)
"SPECIAL DELIVERY
CERTIFIED MAIL
RETURN RECEIPT REQUESTED
                                  June 4, 1964
Mr. Donald Bauer
Bauer Welding and Metal Fabricating, Inc.
County Road C and Highway 8
St. Anthony Industrial Park
Minneapolis, Minnesota 55418
Dear Sir:

"On June 4, 1964, at approximately 10:55 a. m., the undersigned, as Business Representative of Sheet Metal Workers Local 547, together with Mr. David Roe, Business Representative of the Minneapolis Building Trades Council, met you at your office and requested that you recognize Sheet Metal Workers Union, Local 547, AFL–CIO, as the bargaining representative of your employees. You immediately stated that you were too busy to discuss this matter with us and left the room.

"It was our intention to inform you then, and we confirm it now, that Local 547 represents your production and maintenance employees, and has in its possession the written authorization cards signed by a majority of your said employees designating Local 547 as their sole collective bargaining agent, to represent them in negotiating with you their wages, hours and working conditions.

"Because you stated that you were too busy to extend to us the courtesy

of listening to us, we did not have opportunity to suggest to you that the authorization cards be turned over to a neutral person or public official for verification if you have any doubts about the fact that we represent a majority of your said employees.

"You refused our request for recognition by avoiding the issue.

"We hereby again request that you recognize and bargain with Local 547, as the bargaining agent for your production and maintenance employees. We again extend to you the opportunity to have the signed authorization cards checked by a neutral person or public official against your payroll records, in the event you have any doubts about the fact that Local 547 has been designated bargaining agent by a substantial majority of the employees in question.

"Unless I hear from you by noon Friday, June 5, 1964, I will have no alternative but what to assume that you have again rejected our request for recognition, and do not wish to avail yourself of having the authorization cards verified.

"I can be reached at my office, FE 6–0129.

> Very truly yours,
> KENNETH L. JOHNSON
> Business Representative
> Sheet Metal Workers Union,
> Local 547, AFL–CIO

ao

cc. Mr. David Roe, Business Representative
    Minneapolis Building Trades Council
    117 Southeast Fourth Street
    Minneapolis, Minnesota 55414"

In talking with various employees about the Union's bargaining request, Bauer showed some of them the above letter, explaining that "he was too busy to talk to" the Union's representatives and thus he had not done so.

Prior to June of 1964 it had been petitioner's policy not to pay employees for legal holidays which fell on Saturday or Sunday. Immediately after the Union made its request for recognition, and without prior announcement, petitioner implemented a new policy by paying for holidays which fell on weekends.

On June 9, 1964, Bauer instituted the Operations Communications Committee (hereafter Committee) composed of himself and a rotating panel of three workmen. Bauer determined that the employees who would serve on the Committee should be selected in alphabetical order. Petitioner posted on its bulletin board notice of the formation, structure and purposes of the Committee. The Committee was designed as a means to show:

"1. How to have better understanding of policies

"2. How to make worthwhile improvements

"3. How we all can earn more money

"4. How to clear-up any misunderstandings".

The Committee was to meet, and did meet, once a week initially and less often thereafter. At the meetings all issues were discussed, including grievances over machinery, wages or anything of a like nature. As a result of these Committee meetings, certain improvements were made in the equipment used by the men, a water cooler was repaired, and the discharge of a fellow employee was explained by Bauer to the satisfaction of the workmen serving on the Committee.

On July 2, 1964, an election was conducted by the Board in petitioner's plant to determine whether the Union would represent petitioner's employees. The Union lost the election by a vote of 12 to 11. On July 3, 1964, the Union filed timely objections to the alleged improper conduct of petitioner which purportedly affected the results of the election. The Regional Director of the Board upheld the Union and set the election aside, ordering a re-run of the same. The Union, invoking the doctrine of Bernel Foam Products Co., Inc., 1964, 146 NLRB No. 161, chose not to have the re-run but instead asserted its rights to represent

petitioner's employees on the basis of the 15 authorization cards submitted earlier to it by the employees.

In October 1964, after the instant complaint had been issued but before the hearing herein was conducted by the Examiner, John Schauls and Frank Barnes [2] initiated, sponsored and solicited signatures to a petition which read:

"We, the undersigned, do not want, or desire to have the Sheet Metal Workers International Association Local Union Number 547, or any other union to represent us. We believe we can do our own negotiating with Mr. Donald Bauer."

Some 13 of petitioner's rank and file employees were among the 18 signers of the petition. Of these 13 employees, 9 had signed authorization cards in May. Employees were solicited for their signatures numerous times. Schauls' efforts were particularly fruitful with respect to employees whom he supervised in the welding department. When one such employee persisted in his refusal to sign, Schauls reminded him that he was the newest welder and that his refusal must indicate that he did not like his job. Schauls directed some employees to Barnes' office, and they signed the petition there. On one occasion two employees who worked under Al Handel, foreman of the fabricating department, and who normally received their paychecks in person from Handel, were told that their checks were to be picked up from Barnes' office. Upon arriving there, Barnes attempted to solicit their signatures on the petition.

The Board, in substantially adopting the findings, conclusions and recommendations of the Examiner, concluded that petitioner violated § 8(a) (5) of the Act by refusing, on June 4, 1964, and thereafter, to bargain collectively with the Union as exclusive bargaining representative of petitioner's employees. Petitioner was also held to have violated § 8(a) (2) of the Act by dominating and interfering with the formation of a labor organization through the establishment of the Committee, and in granting financial and other support thereto. Finally, petitioner was held to have violated § 8(a) (1) of the Act (1) by the compulsory assembling and detaining of employees after working hours for the purpose, inter alia, of impeding their attendance at a meeting known by the petitioner to have been called by the Union; (2) by threatening to enter into a "sweetheart contract" with the Union in betrayal of the employees' interests; (3) by threatening to discontinue existing benefits if the employees chose the Union to negotiate in their behalf; (4) by granting a new benefit in the form of pay for holidays falling on week-ends to induce the employees to forego Union representation; and (5) by initiating and sponsoring among the employees a petition which purported to repudiate the Union. The relevant sections of the Act are set out at f. n. 1, supra. We uphold the Board's contentions and enforce its order as to the § 8(a) (1) and (2) violations. However, we reverse the Board and do not enforce its order on the § 8(a) (5) issue, holding that petitioner was not in violation thereof.

2. The Examiner and the Board found Schauls and Barnes to be supervisors, in spite of the fact that, pursuant to the Union's approval, these men had voted in the July 2, 1964, representation election. Schauls was found to be a "leadman" in the welding department. Barnes, who was in charge of the shipping department with supervisory status over other employees, was also found to be a part of management. A crucial factor in the Examiner's conclusion was that Bauer excluded these men from the Committee. Bauer had stated in a written notice that "there will be no leadman or management men on this committee". Barnes was excluded from the Committee, even though by alphabetical order he was due to serve. Bauer's tacit action in rejecting Barnes as a Committee member strongly supports the Examiner's conclusion that petitioner's employees did not view Schauls and Barnes merely as "fellow employees", as was the situation in Montgomery Ward & Co., Inc., 1956, 115 NLRB No. 92 at page 647, enforced, 2 Cir., 1957, 242 F.2d 497, certiorari denied, 355 U.S. 829, 78 S.Ct. 40, 2 L. Ed.2d 41.

■■ It is almost beyond necessity to repeat the universally accepted criterion that the Board's findings must be upheld under 29 U.S.C.A. § 160(e) if supported by substantial evidence in the record considered as a whole. See, e. g., N. L. R. B. v. Walton Mfg. Co., 1962, 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed.2d 829; Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Coachman's Inn, 8 Cir., 1966, 357 F.2d 134, 137; N. L. R. B. v. Ritchie Mfg. Co., 8 Cir., 1965, 354 F.2d 90, 97–98; Independent Stave Co. v. N. L. R. B., 8 Cir., 1965, 352 F.2d 553, 558. However, these and additional authorities support the corollary proposition that such findings can be set aside when there is not substantial evidence to support them. See Fabri-Tek, Inc. v. N. L. R. B., 8 Cir., 1965, 352 F.2d 577, 583; N. L. R. B. v. Council Mfg. Corp., 8 Cir., 1964, 334 F.2d 161, 163.

■■ We have examined the record here in detail and conclude that the Board's findings with reference to violations of § 8(a) (1) and (2) are supported by substantial evidence. It is clear that there was substantial testimony and other evidence to support all conclusions in these areas. Admittedly there is conflicting testimony on some issues but "Adverse decisions on matters of credibility form no basis for attacking the Board's findings." N. L. R. B. v. Ritchie Mfg. Co., supra, at f. n. 4, 354 F.2d p. 94. See, also, Jas. H. Matthews & Co. v. N. L. R. B., 8 Cir., 1965, 354 F.2d 432, 438; Marshfield Steel Co. v. N. L. R. B., 8 Cir., 1963, 324 F.2d 333, 336; N. L. R. B. v. Morrison Cafeteria Co. of Little Rock, Inc., 8 Cir., 1963, 311 F.2d 534, 538.

Concerning the § 8(a) (2) violation, petitioner alleges that:

"There is no evidence in the record even suggesting there was any discussion at meetings of the Operations Communications Committee relating to grievances, hours of employment, wages, or conditions of work * * * which bring it within the definition of 'labor organization' as set forth in the Act. * * * Further, there is ab-solutely no evidence the Operations Communications Committee was formed or recognized as representative of the employees."

Clearly, such is not the case. There is abundant testimony indicating that Bauer intended for his employees to present their grievances through the Committee and that the Committee suggested and was responsible for many improvements in "conditions of work". As already indicated, the Committee was the impetus directly responsible for purchasing new equipment, for increasing the effectiveness of existing equipment, etc. The employees' "grievance" concerning the discharge of a fellow employee was also cleared up in a Committee meeting. The tests for a violation of § 8(a) (2) have been met herein. N. L. R. B. v. Cabot Carbon Co., 1959, 360 U.S. 203, 210–213, 79 S.Ct. 1015, 3 L.Ed.2d 1175; N. L. R. B. v. C. Nelson Mfg. Co., 8 Cir., 1941, 120 F.2d 444, 445.

Viewed as a whole, all of petitioner's activities together clearly indicate an overriding union animus and establish a violation of § 8(a) (1) of the Act. The employees' rights to organize were hampered by both improper threats and allurements. N. L. R. B. v. Douglas & Lomason Co., 8 Cir., 1964, 333 F.2d 510, 514; Joy Silk Mills, Inc. v. N. L. R. B., D.C.Cir., 1950, 87 U.S.App.D.C. 360, 185 F.2d 732, 739, certiorari denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350. Adopting the reasoning set out in f. n. 2, supra, it is evident that Barnes and Schauls were a part of management and were acting on behalf of management in circulating the anti-Union petition in October of 1964. See Colson Corp. v. N. L. R. B., 8 Cir., 1965, 347 F.2d 128, 137, certiorari denied, 382 U.S. 904, 86 S.Ct. 240, 15 L.Ed.2d 157. The § 8(a) (1) violations need no further discussion.

Turning to the § 8(a) (5) violation, we initially find no fault with the Board's holding that the authorization cards *per se*, presented by the Union to support its demand for recognition, did clearly and unambiguously authorize the Union to represent the signers for the purpose of

collective bargaining. However, we do not agree with the Board in its conclusion as to the May 19, 1964, covering letter, set out supra, mailed out with the authorization cards. The Board stated:

"* * * although [the covering letters] refer to an election, [they] unequivocally state that it is the signer's authorization of the Union to represent him that is sought. We therefore see no misrepresentation or ambiguity in the letter. Thus, subjective evidence as to the intent of the signers is irrelevant, and we do not rely on such testimony."

The letter, which explains the purpose of the authorization card, is most revealing. It states by its plain terms that the employee's signature on the enclosed authorization card would only authorize the United States government to conduct a secret election within petitioner's plant. The tenor of the letter is entirely different from that of the card itself. The letter attempted to give, and apparently succeeded in giving, the impression that upon the signing of sufficient authorization cards the Board then, and only then, would conduct an election. The letter is both ambiguous and a skillful attempt at misrepresentation. For example, the letter begins, "YOU CAN HAVE A UNION IN YOUR PLANT IF YOU WANT ONE!" It continues:

"Just fill out the enclosed authorization card and return it to us. The card will then be turned over to the National Labor Relations Board, a branch of the United States Government.

"* * * The National Labor Relations Board will then conduct an election in your plant by secret ballot.

"However, the United States Government will conduct an election *only* if we show them that the employees have asked us to represent them. *Your employer will never see these cards.*

* * * * * *

"* * * The sooner we get the cards back, the sooner Uncle Sam will conduct an election in your plant, and we will be able to help you." (All emphasis in the original.)

The emphasis throughout the letter is on the signing of the authorization cards, which would "then", and not before, allow the Board to conduct an election to determine the representation question. We firmly believe the letter was designed for the purpose of, and succeeded in, creating the impression in the minds of the employees that the Union would become the bargaining agent only by winning an election, and that the only purpose in signing the accompanying authorization card was to bring about such an election. If we were to apply here the law of contract interpretation, we would conclude that an ambiguous document must be construed most strongly against the maker, who had it initially within its power to control the language of the document. The situation is similar here.

■ In support of the above determination, we note that no less than six of the petitioner's employees testified before the Examiner that they signed and returned their cards to the Union believing only that they were indicating their desire for an election. One of the respondent's own witnesses, David Nelson, testified on direct examination:

"Q. From reading this letter, and the card, did you know what the effect of signing the card was?

"A. I had the idea that the signing of the card meant that a person was interested in being represented by this particular union, and that after talking to a few in the shop, that the election would determine whether or not we would be definitely represented by this union.

"Q. When you completed the card, where were you?

"A. I was at home with my family.

"Q. Was any union representative present?

"A. No, no one was present.

"Q. Was any other employee of Bauer Welding Company present?

"A. No.

"Q. Was the time that you returned the card near the date there?

"A. Yes, it was, I believe, the following day the card was returned.

"Q. At the time that you signed that card, did you personally want the union to represent you?

"A. I wasn't sure, because I didn't know anything about it. I never worked in a union shop before, so I had no knowledge of it, outside of the letter which I had received with it. I talked to very few, so my information was very scarce."

The Board objects to the admission of such testimony on the basis of language to which we lend approval in Colson Corp. v. N. L. R. B., supra, at page 135 of 347 F.2d, wherein we acknowledge that an employee's after-thoughts as to why he signed a union authorization card could not negate his overt action of having signed the card. There can be no doubt that this is the general rule without misrepresentation being present. Misrepresentation, however, is present herein to the extent that petitioner's employees relied on the letter and believed that they were only showing a desire to have an election by signing the cards. Without this qualification, a union could be blatantly guilty of the most flagrant misrepresentation and be protected through the disallowance of any employee's testimony, once the employee signed the authorization card. Cf., Restatement of Torts, § 525 (1938). See, N. L. R. B. v. Peterson Bros., Inc., 5 Cir., 1965, 342 F.2d 221, 224.

Even without considering the testimony of the employees as to why they signed the cards, there still is strong and persuasive evidence indicating that many of the employees who signed the cards did not intend anything more than just authorizing an election by their act. The strongest evidence is the May 19, 1964, letter itself. Further evidence indicates that Johnson, who signed the letter, told Gerald Wachowiak, in a telephone conversation which took place on or about June 2, 1964, that:

"A. Well, he said that they had a majority of the cards, and that after he received a few more cards, there would then be an election.

"Q. Mr. Johnson told you at that point that there would be an election, is that correct?

"A. Yes."

Respondent, in effect, contends that the follow-up letter sent out by the Union on May 26, 1964, set out supra, cleared up any ambiguity present from the original May 19, 1964, letter. It is not necessary to rule on this contention since it is clear from the evidence that all authorization cards submitted were dated on or before May 26, 1964, at a time prior to when the May 26, 1964, letter came out. Thus, the May 26, 1964, letter could not have had any bearing herein.

Under these circumstances, the Board's holding that the Union represented a majority of petitioner's employees is not based on substantial evidence, is completely erroneous and must be set aside. The Board itself, along with a number of courts, has lent support to the proposition that where employees are misled into signing authorization cards through the belief that by so signing they are requesting an election only, the union holding such signed cards is not necessarily the bargaining representative for the persons so signing the cards. See Englewood Lumber Co., 1961, 130 N.L.R.B. No. 394, wherein the Board states at pages 394–395:

"Like the Trial Examiner, we find that the union authorization cards, urged by the General Counsel as establishing such majority status, were unreliable for this purpose. As set forth in more detail in the Intermediate Report, the Union did not tell the employees that by signing the cards they were authorizing the Union to represent them; rather, the employees were told that the cards were necessary in order that the Board might conduct an

election by secret ballot in which every employee would have an opportunity to express his preference. Ten employees who had signed cards testified that when solicited they were told that the cards were for a Board election. Bentley, a leader in soliciting, testified that he told practically everyone he talked to that the cards would be sent to the Board so that a secret election could be held. In these circumstances, considering only what the employees were told, and not what may or may not have been their subjective reaction to what they were told, we do not think it can reasonably be said that the employees, by their act of signing authorizations, thereby clearly manifested an intention to designate the Union as their bargaining representative."

In N. L. R. B. v. Koehler, 7 Cir., 1964, 328 F.2d 770, the court, in finding that the Board's conclusion as to representation was clearly erroneous, stated at page 773, that it reached its decision

"* * * in view of the overwhelming proof that many employees signed cards because they were promised that such cards were to be used for the purpose of obtaining an election, with a secret ballot, to be conducted by the Board."

In doing so, the court set aside the Board's finding that the union represented a majority of the employees at the time it sought recognition as the bargaining agent.

In N. L. R. B. v. Peterson Bros., Inc., supra, the court held that because of an ambiguity in the authorization card the holding of the Board as to representation was clearly erroneous. Therein Chief Judge Tuttle stated, at page 224 of 342 F.2d:

"In view of the language on the face of the card that 'this is not an application for membership' and the language that in the alternative it is 'for an NLRB election' we think there was a burden on the General Counsel to establish by a preponderance of the evidence that the signer of the card did, in effect, what he would have done by

voting for the union in a Board election. We think that in refusing to consider the subjective intent of the signer of the card, in light of the ambiguity on the face of the card, the Board erred. Upon a careful examination of the record we conclude that the trial examiner correctly found that the designation cards signed by Rhodes and Wright were not valid designations for the union. We conclude that the Board's finding to the contrary is not based on substantial evidence on the record as a whole."

The court denied enforcement of the § 8 (a)(5) charges. In so doing, it cited with approval N. L. R. B. v. Koehler, supra. In critical mood, Judge Tuttle stated at page 225:

"It would be very simple for the union to prepare a card that in an unambiguous form would authorize union representation as a bargaining agent. If the union also wished to have cards signed to call an election this would also be a very simple matter. There can be little excuse for combining the two in a card that makes possible the misrepresentation that the Board found to have existed * * *."

In the instant case the authorization card clearly and without ambiguity designated the Union as the employees' bargaining agent. The covering letter, however, is most ambiguous and most misleading. It could well be classified as intentional double-talk. The effect of the covering letter herein is no different from the effect of the authorization card in *Peterson Bros.*

In N. L. R. B. v. Winn-Dixie Stores, Inc., 6 Cir., 1965, 341 F.2d 750, certiorari denied, 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed. 2d 74, the court, while finding that the Board held correctly that a majority of the employees had authorized the union to be their bargaining representative nevertheless stated at page 754:

"The decisions of the Board as well as the opinions of the courts place more emphasis upon the representations made to the employees at the time the cards were signed than upon the lan-

guage set forth in the cards. If in fact misrepresentations are made by the union to employees to the effect that the only purpose of the card is to authorize the union to petition the Board for an election, the card will not be construed to authorize representation, even though it contains language to that effect. N. L. R. B. v. Koehler, 328 F.2d 770 (C.A. 7); Englewood Lumber Company, 130 N.L.R.B. 394."

We have considered the cases cited to us by respondent and find them to be factually distinguishable and of no persuasive support.

We have examined the record herein in detail and conclude that the Board's findings with reference to violations of § 8 (a)(1) and (2) are supported by substantial evidence. Accordingly, the Board's order with reference to § 8(a) (1) and (2) violations will be enforced. There is, however, no substantial evidence supporting the § 8(a)(5) charges. Therefore, those portions of the Board's order and appendix dealing with the § 8(a)(5) violations need not be complied with by petitioner insofar as they contemplate the Union as being the exclusive bargaining representative of petitioner's employees.

Enforced as modified.