**FILLER PRODUCTS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 10749.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 13, 1967.

Decided March 31, 1967.

J. Frank Ogletree, Jr., Greenville, S. C. (Thompson, Ogletree & Haynsworth, Greenville, S. C., Calhoun & Johnston, Atlanta, Ga., and Bowles & Boyd, Richmond, Va., on brief), for petitioner.

Warren M. Laddon, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Elliott Moore, Atty., N. L. R. B., on brief), for respondent.

Before BOREMAN and BRYAN, Circuit Judges, and RUSSELL, District Judge.

DONALD RUSSELL, District Judge:

Filler Products, Inc. (hereinafter called Company) petitions the Court to set aside an Order of the National Labor Relations Board finding it guilty of interfering with its employees' right to organize, dis-

criminatorily discharging an employee, refusing to reinstate strikers engaged in a strike "prompted in part by unfair labor practices" and failing to bargain with the representative of its employees. 29 U.S.C.A. Section 158(a) (1) (3) and (5). The Board, in turn, has cross-petitioned for enforcement of the Order.

The proceedings involved the operation of the Company's food processing plant at Forest Park, Georgia,[1] and dealt with events limited in time to a period of less than a month. In the latter part of May, 1964, an organizational campaign was begun among the unorganized workers at such plant by the United Packinghouse, Food and Allied Workers, AFL-CIO (hereinafter called Union). On June 15, after this organizational drive had proceeded for about two weeks, the Union, asserting that "a substantial number" of the Company's employees wished to be represented by it for purposes of collective bargaining, filed its petition with the Atlanta, Georgia, Regional office of the National Labor Relations Board for a "representation election". This petition, mailed by the Union to the Board on June 15, was received in the Regional Office on June 16; and a copy was apparently on the same day mailed to the Company. Also, on June 15, manifestly as a contemporaneous act, the Union wrote, though it did not mail until the next day, a registered letter advising the Company that a majority of its employees were members of the Union and requesting recognition as the bargaining agent. Delivery of this letter to the Company was attempted sometime on June 18 but was refused by the Company. The letter was returned to the Union, unopened, on or after June 19.

At the commencement of work in the plant on June 18, a strike began in the shipping room of the Company and quickly spread to the other departments. Five days later the strike was abandoned but, upon application for reinstatement, the strikers were refused, the Company contending that they had, during the strike, been legally replaced. The Union, thereupon filed charges under the National Labor Relations Act against the Company with the Regional Office of the Labor Board. The Director of the Regional Office, after investigation, concluded that there was "insufficient evidence" to support a complaint based on the charges submitted by the Union. Upon appeal by the Union from this decision of the Regional Director, the General Counsel of the Board "sustained in part" the appeal and found that there were certain circumstances present in the case "warranting determination based on record testimony developed at a hearing before a trial examiner". The Complaint in this proceeding was accordingly issued and hearings had. The Trial Examiner filed a report, which, as modified in one important particular, was adopted by the Board. The Company's challenge is directed to this order.

## JURISDICTION OF THIS COURT

 This Court's jurisdiction of the proceedings rests upon the uncontested allegation of the petition that the Company maintains a place of commerce in the State of North Carolina, within this Judicial Circuit. Cf., Olin Industries, etc. v. National Labor Relations Board (5th Cir., 1951) 191 F.2d 613, n. 1, reh. den. 192 F.2d 799, cert. denied 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332, reh. den. 343 U.S. 970, 72 S.Ct. 1055, 96 L.Ed. 1365.

## FUNCTION OF THE COURT IN THIS TYPE OF REVIEW

 The role of the Court in proceedings such as these has been often stated. It is the province of the National Labor Relations Board to find the facts, pass on the credibility of witnesses, and resolve contradictions in the testimony; and only if such findings are not supported by substantial evidence on the record considered as a whole will the Court set aside such findings. Northern Virginia Steel Corporation v. N. L. R. B., 300 F.2d

---

1. The Company, also, had plants in Illinois and Puerto Rico, both of which were unionized. These plants are not involved in this proceeding.

168, 170, 4th Cir., 1962. But, as this Court emphasized in N. L. R. B. v. A. S. Abell Company, 327 F.2d 1, 5, 4th Cir., 1964, "This is not to say, however, that our (the Court's) inquiry should go no further than to ascertain whether there is evidence in the record which, in and of itself, tends to support the Board's conclusion. Rather we are obliged to scrutinize the whole record, taking into account whatever fairly detracts from the evidence relied upon by the Board." In short, the requirement of "substantial evidence" is properly held to mean that, "The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." Universal Camera Corp. v. National Labor Relations Bd., (1951) 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456.

## FINDINGS OF COERCIVE CONDUCT UNDER SECTION 8(a) (1)

The first findings of the Board involve the charges of violations of Section 8(a) (1) of the Act. Such findings rest upon claims of coercive conduct on the part of the president of the Company, impermissive interrogations of employees by certain alleged supervisors, and unlawful interference with union activity through the closing of certain doors to the Company's plant during the organizational campaign.

The last of these charges may be quickly disposed of. During the period of the union drive, the Company closed two vertical, overhead doors, one to its shipping room and the other to one of its production departments. The Company's position was that the doors were closed at the instance of the Federal food inspector. The doors were not locked and were only "partially" closed. Nor were the doors normally used by the employees for entrance to the plant.

The Board based its finding in this matter on a single piece of testimony given by an employee to the effect that a supervisor had stated to him "the reason the doors are down, someone has been issuing out cards and a rat has been sneaking in the door". From that testimony, the Board concluded that the closing of the doors was "designed to interfere with the employees' union activity and restrain them in the exercise of their rights" and was "a violation of Section 8(a) (1)." There was not a particle of evidence that any Union representative ever had used or attempted to use, the doors in question. The reference in the conversation with the supervisor to a "rat * * * sneaking in the door" was thus without any support in the record; no such incident was even hinted at in the testimony. Nor did the Union offer any other evidence to show that the closing of the doors interfered in any way with the Union's efforts to organize the Company's employees. Under these circumstances, the bare comment of a supervisor, whose very status as a supervisor was strongly disputed, without the least supporting evidence of any actual interference with union activity, is insufficient to warrant the finding made by the Board.

The Board further found violations of Section 8(a) (1), based on coercive employee interrogation, and improper surveillance, or creation of the impression of surveillance, of union activity on the part of the president of the Company.

The testimony of Sarah Pruitt, an employee on the night shift, and her husband, Harold Pruitt, is relied on by the Board for its finding of coercive employee interrogation by the Company's president. When Sarah Pruitt left work at about one-thirty on the morning of June 13, she met her husband and proceeded to drive away from the plant. The president of the Company in his car stopped them. He came to the side of the Pruitt car. After Mrs. Pruitt admitted she was an employee, Filler asked whether she had signed a union card. At first, Mrs. Pruitt denied she had but, after

Filler repeated insistently his question, she acknowledged that she had signed such card. Filler thereupon observed that he already knew that she had and added "that I also knew (know) what was (is) going on back there in the plant." He went on to add that he knew "about the Union business". As evidence of his knowledge of Union activity, he proceeded to tell Mrs. Pruitt she "had attended two meetings" and that she was "supposed to attend another meeting tomorrow", information that incidentally was accurate. In referring to the Union, Filler said that the employees were "all just cutting (their) own throats", and "that he really didn't need the night shift, he just kept the night shift on so that we would have something to do" and concluded by remarking that he could "close the plant down".

■ At the conclusion of the meeting the next day, two employees testified that they had observed Filler driving "slowly" in his car about half a block from the place where the Union had met. Two days later the employees working on the night shift in the corn chip department reported for work wearing Union buttons. About 10:30 to 11:00 o'clock that night Filler appeared in the department, walked around the department observing the employees with their Union buttons and making notes on a pad he carried. There was testimony that such an appearance by Filler at that hour was very unusual and extraordinary. Filler himself offered no explanation for his visit or of the purpose or nature of his entries on his pad, though some of the supervisory force did testify that Filler visited from time to time the plant and made notes of corrective actions he wanted taken. President Filler did not testify. The testimony given about his conduct thus stands uncontradicted in the record and must be assumed as accurate.

■■ The Board's finding of violation of Section 8(a) (1) on the basis of this undisputed conduct of the Company's president in interrogating Mrs. Pruitt has adequate evidentiary basis. His interrogation went beyond permissible limits. While mere inquiry of an employee about union affiliation may be innocuous under the Act, N. L. R. B. v. Covington Motor Company, 344 F.2d 136, 137, 4th Cir., 1965, it must be viewed in the context of all the surrounding circumstances, N. L. R. B. v. Associated Naval Architects, Inc., 355 F.2d 788, 791, 4th Cir., 1966. And it is "settled that whether an employer has employed language which is coercive in its effect is a question essentially for the specialized experience of the NLRB." Daniel Construction Company v. N. L. R. B., 341 F.2d 805, 811, 4th Cir., 1965, cert. denied 382 U.S. 831, 86 S.Ct. 70, 15 L.Ed.2d 75. In this case, the very manner of the questioning, the urgent repetition of the demand to know whether Mrs. Pruitt had joined the Union, the ominous references to possible plant closing, the asides about knowledge of Union meetings, all combined to create an atmosphere of intimidation and threat.

■ The other finding based on the conduct of President Filler involved the claim of surveillance of Union activity. His unexplained presence observed near the Union meeting on June 14, taken in conjunction with his prior statement to Mrs. Pruitt about the meeting and his knowledge of the Union activities, and his visit to the plant on the night of June 17, with pad, observing the employees wearing union buttons, combine to support an inference that Filler either had under surveillance the Union, or artfully sought to give that impression. This reason is fortified by the failure of the president to testify or to give any explanation either for his presence near the union meeting or as to why he was present in the plant with pad on the night of June 17. N. L. R. B. v. Lexington Chair Company, 361 F.2d 283, 293, 4th Cir., 1966. Whether Filler had, through surveillance, acquired knowledge of the Union's activities or merely sought by his statements to the Pruitts and demeanor on his visit to the plant to give that impression to his employees, the result is equally unlawful; "the law reasons that when the employer either engages in

surveillance or takes steps leading his employees to think it is going on, they are under the threat of economic coercion, retaliation, etc." Hendrix Manufacturing Company v. N. L. R. B., 321 F.2d 100, 104–105, note 7, 5th Cir., 1963. The finding of a violation of Section 8(a) (1) arising out of his conduct of the president of the Company is predicated on substantial evidence.

The Board, also, made findings of unlawful conduct under Section 8(a) (1) arising out of the interrogations of employees by certain alleged supervisors. Save in the case of Supervisor Davis, none of the alleged supervisors testified and the Company made no effort to dispute the account of such interrogations as detailed by the witnesses for the Board. It contented itself, on the contrary, with the defense that the persons involved did not qualify under the Act as supervisors and that for such reason the Company was not responsible for their actions.

The Company, however, admitted responsibility for the conduct of Davis, who, it conceded, occupied a supervisory status. According to the testimony submitted by the Board, Davis, on June 15, called employee Gant into his office and inquired whether he, Gant, had signed a union card. When he received an affirmative reply, he wanted to know what Arthur Hullum, a shipping room employee, had to do with the Union. When told that he knew nothing of Hullum's activity, Davis asked him for the name of the "Union organizer" in the plant. Gant identified the organizer as "Reverend Dawkins". Shortly thereafter, "Reverend Dawkins" was, the Board found, discharged.

 The other interrogations, relied on by the Board for its findings, were carried out by three persons whom the Company claimed failed to meet the criteria for supervisory status as defined

in Section 2(11) of the Act.[2] This section sets forth several standards or tests by which to ascertain the supervisory status of an employee under the Act. Such standards are stated disjunctively; it is only necessary to satisfy any one of these standards to establish the supervisory character of the employee. Northern Virginia Steel Corporation v. N. L. R. B., 300 F.2d 168, 171, 4th Cir. 1962. In this case, the Board found that all three were supervisors under the Act, having authority to "hire (and) to responsibly direct" the employees in their respective departments. It placed emphasis, too, in its finding on the fact that the persons involved received straight salaries exceeding "by several times the wages paid the hourly rated employees" in their departments.

 It is true that in the *Northern Virginia Steel Case*, supra, at p. 172, this Court indicated that the mere fact that an employee receives straight salary while others in his department are paid on an hourly basis, standing alone, was not sufficient to bring the employee within the classification of supervisor. It is, however, a fact that may be properly considered in connection with the other circumstances of the case. This is especially true in a case where the straight salary is several times that of any other employee in the department. And this seems to have been the extent of the Board's use of this evidence.

Primarily, the Board relied for its conclusion that the three were supervisors upon evidence of the actual exercise of the power to hire and of responsible direction. Specific evidence was offered by the Board that all three of the persons in question had exercised the power to hire certain identified employees in their department. Both Merrill, who was Plant Superintendent and Drobka, who was vice-president of the Company, on

2. "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward or discipline other employees or responsibly to direct them or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C.A. Section 152(11).

the other hand, testified that no one of the three had the power to hire and, so far as they knew, had ever exercised such authority, except in a solitary instance involving one of the persons. Neither Merrill nor Drobka, however, referred in their testimony to the specific employees whom the witnesses for the Board stated had been hired by the three, or disputed that such employees had been hired by one of them.

The Board further supported its claim of supervisory status for the three employees with other evidence of their exercise of supervisory powers over their employees. In the case of Dennis Wranick, one of the disputed supervisors, Merrill admitted that any employee in his (Wranick's) department had "to check with him before leaving work early." He added that such authority extended to situations "only * * * of a routine nature. If a man was ill and couldn't perform his duties then Dennis could excuse him." He further testified that, while Wranick had "assigned overtime", such authority had first to be approved by him. It was even conceded that on one occasion Wranick had specifically been authorized to employ such employees as he needed to carry on the work in his department.

The testimony is even stronger on the supervisory status of Armstrong, about whom there was positive testimony involving his hiring at least three employees in his department. Indeed, counsel for the Company seems at one point in the record to have conceded Armstrong's status. In reply to the Trial Examiner's question, "what is your position as to Armstrong—Armstrong's position. Is he supervisor, non-supervisor?", counsel for the Company answered, "Supervisor within the meaning of the law." Downs, the third employee involved in the controversy over supervisory status, has hired three employees, according to their testimony. The Company, while denying that Downs had such authority, did not contradict or seek to explain the testimony of the employees who stated Downs had hired them.

All three of the disputed supervisors did direct to some extent the work of the employees in their departments. Wranick apparently was sufficiently in charge of his department that he had the initial responsibility to determine whether production schedules in his department required overtime work. Employees in his department testified he gave them "instructions on what was to be done" and determined whether the product was "all right". Armstrong, too, it was testified, passed on whether the work had been done by the employees in his department, and, when he was away in other departments, he told the employees what to do. Downs, according to employees in his department, checked to "see if the boys got the loads made up" and criticized them on occasions for faulty work.

 From this review of the record, it would appear that the Board had an adequate evidentiary basis for its finding that Wranick, Armstrong and Downs met the qualifications of supervisor. For the conduct of such supervisors in their relation with the employees in their departments, the Company is responsible.

Witnesses for the Board testified that all three of these supervisors interrogated them about the Union and their connection with it. None of this testimony was disputed by the Company. One of the supervisors, Downs, prefaced his inquiry of an employee by referring to a conference he had just had with President Filler about the Union. The employees were solicited by all three to investigate and report back on Union activity. Downs told one employee that by doing so he "would help both of us, both of us needed a job". Armstrong told an employee under his supervision that, "if you don't join no union, you and your boys— * * * will have a job as long as I'm foreman". Wranick on two occasions pressed one of the employees working under him to secure for him information about the Union and its activities.

 These were not innocent inquiries nor were they "of trivial conse-

quence". It was permissible for the Board to find that the language used involved "promise of favor or benefit in return for resistance to the Union". The reference to a need for "a job", made in connection with the discussion of the Union, could be construed as threatening. The finding of the Board that these supervisors, by such interrogations, violated Section 8(a) (1) is accordingly supported by substantial evidence. N. L. R. B. v. Overnite Transportation Company, 308 F.2d 279, 281, 4th Cir., 1962.

## DISCRIMINATORY DISCHARGE OF JAMES DAWKINS

The Board, also found that James Dawkins was discharged by the Company on Monday, June 15, and that such discharge was made because of his union activity and violated Section 8(a) (3) and (1) of the Act.

James Dawkins had been employed in March, 1964, as a corn cooker. At first, it seems admitted, he proved a satisfactory employee. For some weeks before the termination of his services, the Company claims his services deteriorated. He received several reprimands. Even his own testimony indicates that the Company had reason to be less than satisfied with his work. Only a few days before his discharge, he had an argument with his supervisor and, by his own account, it would appear he was insubordinate on this occasion.

He appears to have been the leader in the union organizational drive. He approached and persuaded the Union to undertake the organization of the plant. He arranged the union meetings at a Church of which he was pastor and was certainly the most vocal employee at the Union meetings.

It was the contention of the Company that at the end of work on Friday, June 12, Dawkins' services were terminated because of unsatisfactory work. Nothing, however, was said to Dawkins to indicate that his services were terminated. Neither did his supervisor prepare the customary separation notice. On the Sunday night following Merrill,

the employer's plant superintendent, telephoned Dawkins not to come in Monday. There is some conflict between Merrill's testimony and Dawkins' as to whether Merrill told him at this time that the reason for such instruction was that his cooker was broken and was in the process of being repaired. Dawkins testified that he was given this explanation in a telephone conversation with Merrill on Tuesday, June 16. Merrill said that, though he tried to reach Dawkins on Tuesday, he was unable to reach him but that in his conversation on the preceding Sunday he had told Dawkins that his cooker was broken. On Monday, June 15, Davis was told, according to Gant's testimony, that Dawkins was the "Union organizer". Admittedly, the Company knew on the 16th that Dawkins was a leader in the Union campaign. And that was the day when Dawkins was told not to report again until called, according to Dawkins' version. In the meantime, he had been replaced.

The Board found that Dawkins was discharged effectively after the Company had learned through Davis that Dawkins was the "Union organizer". The Company's position, on the other hand, was that Dawkins was discharged on June 12 because of his unsatisfactory work.

It may well be that the Company had ample cause to discharge Dawkins on June 12. He had been reprimanded for unsatisfactory work on several occasions. He had been on at least one occasion insubordinate. But a justifiable ground for dismissal of an employee is no defense to an unfair labor charge arising out of such dismissal if such ground was a pretext and not the moving cause for the dismissal. National Labor Relations Board v. Solo Cup Company, 237 F.2d 521, 525, 8th Cir. 1956. And in determining the reason for such discharge, "The circumstances of each case (of employee discharge) must be weighed to determine what motivations truly dominated the employer in laying off or discharging the employee." National Labor Relations Board v. Jones Sausage Co., 257 F.2d 878, 882, 4th Cir

1958. If there is a conflict in the testimony or in the inferences to be drawn from such testimony, " * * * we must uphold 'the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.' " N. L. R. B. v. Overnite Transportation Company, 308 F.2d 284, 288, 4th Cir. 1962.

■ It is difficult to adopt the Company's reasoning that its action on June 12 constituted a discharge of Dawkins. While it is undoubtedly true that no particular language is necessary to effect a discharge, it should be of a character that reasonably leads the employee to believe his tenure has been terminated. National Labor Rel. Bd. v. Cement Masons Local No. 555, 225 F.2d 168, 9th Cir. 1955. The company did nothing to indicate to Dawkins any such discharge. Cf. National Labor Rel. Bd. v. Cement Masons Local No. 555, supra. In fact, its conduct subsequent to June 12 was inconsistent with that contention.

■ Whether Dawkins' discharge [3] was prompted by the information secured by the Company of his union activities or because of his unsatisfactory services represented an issue to be resolved by the Board. There was sufficient basis in the record for the inference drawn by the Board that he was replaced as an employee because of his union leadership. Certainly until Monday afternoon, it is not clear that the Company had discharged Dawkins. Merrill had actually testified that he wanted to delay firing Dawkins until he could have Dawkins' supervisor present. Yet, with what may fairly be regarded as considerable haste, he replaced him without going through the procedure which Merrill claims he had determined on the Sunday night previous. What could have caused this change in attitude? The Board found that the changed attitude was motivated by the information secured by Davis through his interrogation of Gant. It is not within our province to set aside that finding, even though we may have reached a different conclusion if we were free to choose between the "contradictory views".

The Board's finding that the discharge of James Dawkins was unlawful under Section 8(a) (3) and (1) is based on substantial evidence.

### THE STRIKE AND CLAIM OF STRIKERS FOR REINSTATEMENT

The remaining findings of the Board focus on the strike at the Company's plant on June 18, the failure of the Company to deal with the Union as the bargaining agent for its employees during such strike and to reinstate the strikers at the abandonment of the strike on June 23.

The Trial Examiner found that, while economic reasons may have been "a partial cause" for the employees' participation in the strike, "the principal moving force which precipitated the strike" was the reaction of the employees to the Company's refusal to accept the Union's letter demanding recognition as bargaining agent. Since the record showed conclusively that the employees could not have known that the Company had refused the letter from the Union until the day after the strike began, the Board rejected this conclusion of its Trial Examiner. It referred to the conduct of the Company which it had found violated Section 8(a) (1) of the Act and then found that the strike "was prompted by mixed motives, some of which were economic in nature, while others stemmed from the Respondent's (Company's) unfair labor practices including the termination of Dawkins and other unlawful actions directed against the employees."

This finding in our judgment is not supported by substantial evidence. The

---

3. One of the established ways to determine in disputed cases when an employee is discharged is to ascertain when he was replaced. National Labor Relations Bd. v. Montgomery Ward & Co., 192 F.2d 160, 163, 2nd Cir. 1951. Dawkins was seemingly replaced on the 16th.

record shows that the strike arose in the shipping room when the Company brought in, with the commencement of work on June 18, an employee to check the shipments prepared in the department. The employee was the son of the vice-president of the Company, a student who was accustomed to working in the plant during the summer. He replaced no one. The justification for employing him was the growing number of complaints of errors in shipments as shown by written complaints appearing in the record. The employment of a checker, in the language of the Trial Examiner "touched off a wave of resentment among the regular employees of the shipping room and within a few minutes they decided to go on strike". As they did so, they went through the plant soliciting the other employees to go out with them. The clear motivating force prompting the strike was the addition of the checker in the shipping department. It is not suggested by either the Union or the Board that there was anything unlawful in the employment of such checker or that it was intended in any way to interfere with the Union or to impede its organizational drive.

The Board, in its finding, would infect what was clearly an economic strike with unlawfulness by reliance upon certain casual and ambiguous reasons given by a few employees many months after the strike, some of which were palpably inaccurate. One of the employees, for instance, whose testimony was relied on by the Board for its finding, testified she had walked out because the Company had fired Gant and Hullum. Neither Gant nor Hullum, both employees in the shipping department, was fired; they were among the leaders of the walk-out, inducing the others to join the strike. The other reasons given were equally incredible, particularly in the face of the testimony of the Union officials, who talked to the strikers about the reasons for the strike an hour or so after the strike,

when the events surrounding the strike were fresh in the minds of the strikers. Thus John Hall, the first Union official to meet with the strikers after the strike began, telephoned a Field Examiner for the Board the day the strike began and, after telling the Field Examiner he was unable to find out why the strikers had walked out, inquired what he should do.[4] Hall apparently recognized that the checker's employment did not involve any unlawful conduct by the Company, for, in the same conversation with the Field Examiner, he added there was "no reason" for the strike. Vincent, the District Director of the Union, was equally at a loss to find any illegal cause for the strike. When he arrived on the scene the same day, he indicated he "tried to determine, particularly, what had happened" without success. He pointed out in his testimony, too, that the reason he sought subsequently to communicate with President Filler was "to see if he couldn't find out what the problem was".

 It is true that the Company had previously engaged in certain unlawful conduct under the Act. But for such conduct to invest the strike itself with an unlawful character it must be shown, by credible evidence, to have a causal connection with the strike. Winter Garden Citrus Pr. Co-op. v. National Lab. Rel. Bd., 238 F.2d 128, 129, 5th Cir. 1956; National Labor Relations Bd. v. James Thompson & Co., 208 F.2d 743, 746, 2nd Cir. 1953. We find no such credible evidence in this record.

 Nor is weight to be given to the fact that the Union, in its telegram to the Company and on its placards, referred to the strike as a "strike because of Unfair Labor Practices". Without credible evidence to support it, it can only be regarded as a self-serving statement warranting no finding of fact by the Board.

The Regional Director of the Board summed the whole matter of the strike

---

4. This testimony was received by an offer of proof, made after the General Counsel of the Board refused to authorize the Field Examiner to testify. It will be observed too, that the Board did not offer Hall as a witness.

up fairly, in his letter to the Union transmitting the results of his investigation of the Union's complaint. He said: "The investigation showed that the employees' spontaneous walkout was caused by the employment of a supervisor's son as a checker in the shipping department. There is no evidence that the walkout was caused or prolonged by any unfair labor practices of the Respondent, and the Union's self-serving declaration issued after the strike had begun was insufficient without more to show that unfair labor practices contributed to it. Moreover, the evidence showed that for several days after the walkout the Union's representative attempted to determine the reason which triggered the walkout, while soliciting the employees to abandon their action and return to work."

Apart from the question of the strike's original cause, however, the Board further concluded that, in any event, the Company's "rejection of the Union's letter demand for recognition seemed to prolong the strike" and was unlawful, entitling the strikers to reinstatement on June 23, when the strike was abandoned. The letter of the Union to which the Board refers in this finding was that dated June 15 but not mailed until June 16, advising the Company that a majority of its employees were members of the Union and requesting recognition as "the sole and exclusive bargaining agent" for such employees.

▆▆▆ While it is settled that the choice of a union as bargaining agent in some circumstances may be shown by authorization cards signed by employees without an election conducted by the National Labor Relations Board, Bilton Insulation, Inc. v. N. L. R. B., 297 F.2d 141, 144, 4th Cir. 1961, the conduct of the Union officials shows clearly that it was not the purpose of the Union, by this letter, to accomplish such purpose. Thus, in describing the meeting of the Union which led to the filing of the petition for

election and the writing of the letter, Vincent, the Union's District Director, said that "the group (the employees) voted that we should go ahead and petition the N.L.R.B., for the representation election". Later, at a meeting immediately after the writing of the letter of June 15, Vincent testified that "at that meeting we explained to the people that we had filed a petition (for an election) with the NLRB." At no time did the Union officials indicate to the members that any other means for securing certification would be attempted than that afforded by an election. Cf. N. L. R. B. v. Winn-Dixie Stores, Inc., 341 F.2d 750, 754, 6th Cir. 1965, cert. denied 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74; Bauer Welding and Metal Fabricators, Inc. v. N. L. R. B., 358 F.2d 766, 775–777, 8th Cir. 1966. Vincent wrote this letter under the terms of a union vote which authorized him to seek union recognition by an election and this letter was written merely as an incident to the filing of the petition for an election.

Reference to the petition for an election, filed by the Union, shows the real purpose of the letter. Paragraph 7a of the form petition calls for an allegation that "Request for Recognition" had been made and declined by the employer. The Union, in this case, filled in the paragraph by stating that such demand had been made on the employer by letter on "June 15, 1964" and the employer had given "No reply". The letter was prepared contemporaneously with the petition for an election in order to permit it to make this specific allegation in paragraph 7a, required in the form of petition supplied by the Board.[5]

▆▆▆ Moreover, the Company never accepted the letter and, so far as the record shows, never knew that it included any request for recognition. It may be the Company should have accepted the letter. It asserts it was acting on advice

5. Though prepared and dated June 15, the letter was not actually mailed until June 16. The allegations of the paragraph were thus inaccurate. This is, however, unimportant to the present issues.

of counsel, who feared that the Union was seeking some advantage through self-serving allegations. But, whatever the reason, the refusal to accept the letter is not equivalent to knowledge of the contents of the letter. Nor would the mere refusal of the letter be regarded as such contumacy as to qualify as bad faith in refusing recognition. To justify such a finding would require a conclusion that the Company knew or should have known, under the circumstances the contents of the letter. Cf. N. L. R. B. v. Great Atlantic & Pacific Tea Company, 346 F.2d 936, 939, 940, 5th Cir. 1965. The Company, however, had no reason to assume that the letter represented a request for recognition. It had already been furnished a copy of the Union's petition for an election. It had a right to assume that such petition represented the route the Union expected to travel in its endeavor to establish bargaining rights; the refusal to accept the letter did not represent an artful attempt by the Company to avoid responding to a demand for union representation, a demand which it thought was to be resolved by a "representation election".

The only information that the Company had of the Union's claims as to its representation was included in the allegation of the petition for an election. There, it merely stated that "a substantial number of employees (of the Company) wish to be represented for purposes of collective bargaining by petitioner (Union)." Later it states that the petition is supported by more than thirty per cent of the "Employees in the Unit". It makes no claim to majority representation and placed the Company under no obligation to bargain.

We conclude, as the Regional Director did, that there is no substantial evidence that the strike was "caused by or prolonged by any unfair labor practices" of the Company and that the Company did not violate the Act by failing to bargain with the Union as "the sole and exclusive bargaining agent" of its employees.

Since the strike was an economic strike in its inception and was not prolonged by any unfair labor practice, the Company had a legal right during such strike to replace the striking employees and the employees hired as replacement would be counted in thereafter determining whether the Union has a majority for the purposes of collective bargaining. Radiator Specialty Company v. N. L. R. B., 336 F.2d 495, 500, 4th Cir. 1964. It is conceded in the record that all the strikers, whose reinstatement the Board ordered, were replaced on or before the abandonment of the strike on June 23 when the strikers sought reinstatement. The finding that the strikers should be reinstated is, therefore, without support in the record and must be set aside.

Enforcement granted in part and denied in part.